STURM *v.* BOKER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 14. Argued October 13, 1893. — Decided November 20, 1893.

In 1867 B. and S. entered into a contract which was evidenced by the following writings, signed by them respectively. (1) B. to S., dated September 18: " Enclosed please find our bill of sundry arms, etc., amounting to $39,887.60, for which amount please give us credit on consignment account. As mutually agreed, we consign these arms to your care, to be shipped to Mexico and to be sold there by you to the best advantage. Should these arms not be disposed of at the whole amount charged, we have to bear the loss. Should there be any profit realized over the above amount of bill, such profit shall be equally divided between yourself and us. Also, it is understood that all these goods are shipped by you free of any expenses to us, and that in case all or any of them should not be sold, they shall be returned to us free of all charges. As you have insured these goods, as well as other merchandise, we should be pleased to have the amount of $40,000 transferred to us. Please

acknowledge the receipt of this, expressing your acquiescence in above, and oblige." Accompanying this was an invoice headed " S. in joint account with B." To this S. replied the same month: " I have the honor to acknowledge the receipt of your letter of the 18th inst., in which you enclose bill of sundry arms, amounting to $39,887.60, consigned to me upon certain conditions contained in said letter. In reply I have to say that I accept the terms of said conditions of consignment, and as soon as I obtain the policies of insurance upon said goods will transfer them to you." In October B. wrote S.: " Enclosed we beg to hand you our bill for muskets, amounting to $10,175, for which please give us credit on consignment account. As mutually agreed, we consign these arms to your care, to be shipped to Mexico, and to be sold there by you to the best advantage. Should these arms not be disposed of at the amount charged, we have to stand the loss. Should there be any profit realized over the amount, such profit shall be equally divided between yourself and us. It is also understood that these goods shall be shipped by you free of any expenses to us, and that in case they should not find a ready sale, they shall be returned to us free of all charges. Please attend to the insurance of this lot and have the amount transferred to us in one policy; also please acknowledge the receipt of this, stating your acquiescence in above." Accompanying this was an invoice headed: " S. bought of B. in joint account." The goods were shipped for their destination in Mexico. S. took out policies of insurance on the September shipments in his own name " for account of whom it might concern," which policies were handed to B. by direction of S. The October shipments reached their destination. A large part of the September shipments was lost. B. collected the insurance on such of the policies as were in his hands. *Held,*

(1) That the contract was not a contract of sale of the goods by B. to S., but a bailment upon the terms stated in the correspondence, and as it was clearly expressed in the writings between the parties, it could not be varied by the terms of the printed bill-head of the invoice;

(2) That S., as bailee, was exempted by the common law from liability for loss of the consigned goods arising from inevitable accident;

(3) That there was no undertaking in the contract on his part which took him out of the operation of the common law rule;

(4) That the taking of the policies of insurance in his own name by S. did not tend, under the circumstances, to establish that he recognized his liability for the loss of the goods, as it was clear that, under a policy running to S. " for account of whom it might concern," B. could show and recover, in event of loss, his interest, which was a substantial one;

(5) That certain statements made by S. did not amount to an estoppel, the rule being that a statement of opinion upon a question of law, where the facts are equally well known to both parties, does not work an estoppel.

THE court stated the case as follows:

This suit, as originally instituted, was an action at law by the appellant in the Superior Court of Marion County, Indiana, against the defendants, to recover the sum of $238,000, with interest thereon, which sum, the plaintiff alleged, they were indebted to him. The defendants, being citizens of New York, removed the cause to the Circuit Court of the United States, and, as the claim involved various matters of account, running through a period of several years, the court, on motion of the defendants, transferred the cause to the equity docket, and required the plaintiff to reform his pleadings. In compliance with this order, the plaintiff filed his bill of complaint, setting forth various transactions involving matters of account between himself and the defendants, commencing in September, 1867, and continuing down to September, 1876. The answer of the defendants admitted many of the facts charged, and either denied others or set up new matter in avoidance thereof.

The several items of account presented by the pleadings need not be specially mentioned or separately considered; nor is it deemed necessary, in the view we entertain of the case, to review the immense volume of testimony taken in the course of the litigation — covering about four thousand printed pages — involving irreconcilable conflicts, and including much that is wholly irrelevant. The material facts are clearly established by the written agreement of the parties, and by the admissions made in the pleadings; and the controlling question of law arising thereon, and upon which the correctness of the decree dismissing the bill must be determined, is whether the court below placed the proper construction upon the original contract entered into between the parties, under which the defendants consigned certain arms and munitions of war to the complainant, to be by him shipped to and sold in Mexico. That contract, after some previous verbal negotiations, was embraced in the following correspondence:

"Office of Hermann Boker & Co., No. 50 Cliff Street.

"NEW YORK, *September* 18*th*, 1867.

"General H. STURM, present.

"DEAR SIR: Enclosed please find our bill of sundry arms, etc., amounting to $39,887.60, for which amount please give us credit on consignment account.

"As mutually agreed, we consign these arms to your care, to be shipped to Mexico and to be sold there by you to the best advantage. Should these arms not be disposed of at the whole amount charged, we have to bear the loss. Should there be any profit realized over the above amount of bill, such profit shall be equally divided between yourself and us.

"Also, it is understood that all these goods are shipped by you free of any expenses to us, and that in case all or any of them should not be sold, they shall be returned to us free of all charges.

"As you have insured these goods, as well as other merchandise, we should be pleased to have the amount of $40,000 transferred to us. Please acknowledge the receipt of this, expressing your acquiescence in above, and oblige,

"Yours truly,

"HERMANN BOKER & Co."

Accompanying this letter was an invoice, in form as follows:

"No deduction allowed for errors or damages unless claim is made within five days after the goods are received.

"Herman Funke.   Folio —.

"F. A. Boker.          50 CLIFF STREET, NEW YORK,

"F. Schumacher.                    *Sept.* 18*th*, 1867.

"Mr. H. Sturm in joint acc't with Hermann Boker & Co.

"Payable in gold.

"Terms, net cash.

"Forwarded for your account and risk, per —— ——:

"1 12-pounder battery, brass, complete.. $9,000

"1 3-rifled     do.   iron   do.         8,000

———— $17,000

```
" 73 cases of 20 ea. ⎱ 1,470 Springfield R.
"  1   "    10 "  ⎰   muskets, 8.00.... 11,760
" 74 cases, 3.50......................   259
                                       ───────        12,019
" 1,000 r'ds fixed ammunition, 12 p.,  2.00   2,000
"  504      "         "        24 pd., 2.00   1,008

  " 209 boxes:
" 100,000 Enfield cartridges, 12.00......   1,200

  " 100 boxes:
" 200,000 Maynards, 20.50..............   4,100
                                       ───────         8,308
  " 200 boxes:
" 670 perc. shell, 3 Hotchkiss, 1.25......  837 50
" 680 time fuse, 3       "      1.25......  850 00
" 270 case shot, 3      "       1.55......  428 50
" 180 canister, 3      "        1.00......  180 00
" 153 boxes, painted.........1.50.......   229 50
"  27  "   not painted...:.1.30......    35 10
                                       ───────        2,560 60
                                                  ─────────────
                                             " $39,887 60."
```

To which the complainant replied:

"NEW YORK, *September 26th*, 1867.

"MESSRS. HERMANN BOKER & CO.

"GENTS: I have the honor to acknowledge the receipt of your letter of the 18th inst., in which you enclose bill of sundry arms, amounting to $39,887.60, consigned to me upon certain conditions contained in said letter.

"In reply I have to say that I accept the terms of said conditions of consignment, and as soon as I obtain the policies of insurance upon said goods will transfer them to you.

"Very respectfully, your ob't servant,

"H. STURM."

There was another consignment, the terms of which are contained in the letters of October 24, 1867, as follows:

"New York, *October* 24*th*, 1867.

"General H. Sturm, present.

"Dear Sir : Enclosed we beg to hand you our bill for muskets, amounting to $10,175, for which please give us credit on consignment account.

"As mutually agreed, we consign these arms to your care, to be shipped to Mexico, and to be sold there by you to the best advantage.

"Should these arms not be disposed of at the amount charged, we have to stand the loss. Should there be any profit realized over the above amount, such profit shall be equally divided between yourself and us.

"It is also understood that these goods shall be shipped by you free of any expenses to us, and that in case they should not find a ready sale, they shall be returned to us free of all charges.

"Please attend to the insurance of this lot and have the amount transferred to us in one policy ; also please acknowledge the receipt of this, stating your acquiescence in above. We likewise beg to hand you enclosed the San Francisco draft of Placido Vega, $63,699.60 gold, with protest and power of attorney to collect, with legal interest, same attached. We will allow you a commission for collecting this draft and interest for us of ten per cent off the amount.

"Be kind enough to acknowledge the receipt of this draft.

"Wishing you a pleasant trip and prosperous affairs, we beg to remain

"Yours truly,
"(Signed)      Hermann Boker & Co."

"New York, *October* 24*th*, 1867.

' General H. Sturm.

"Dear Sir: We beg to refer to our annexed letter, contents of which we expressed according to our mutual agreement. We now beg to say, in order to avoid any misunder-

standing hereafter, that with regard to the two lots of new Springfield rifles shipped to your care, viz. :

"1470 and 74 cases and
"1000 " 50 "

we should direct as follows :

"Should these mentioned arms not bring the prices as charged by us, viz., $8.00 apiece for the first and $10.00 apiece for the second lot, then we would respectfully request you to have them returned to us free of expenses, as agreed.

"Please express your acquiescence in above and oblige,

"Yours truly,

"(Signed)  HERMANN BOKER & Co."

The invoice which accompanied this last consignment is as follows :

"Office of HERMANN BOKER & Co.,

"No. 50 Cliff Street, New York, October 24, 1867.

"H. Sturm, Esq., N. Y. :

"Bought of Hermann Boker & Co., in joint account,

"50 cases containing:

"1000 new Springfield muskets @ $10............$10,000
"50 cases @ $3.50................................ 175
                                                 _____

                                      $10,175"

While it is clearly established that both of these consignments were made upon the same terms and conditions, the invoices which accompanied them differed in some respects. The bill accompanying the October consignment was entirely in writing, while the invoice accompanying the September consignment was written under a printed bill-head of the defendants. The printed heading was not changed except by erasing the words "bought of" and inserting in their place the words "Mr. H. Sturm in joint acc't with." The words "payable in gold" appear to have been stamped on the bill, but whether this was done at the time of its delivery to the complainant or subsequently, when the defendants regained possession of

the bill, is a question of dispute between the parties, and under the testimony it is a matter of grave doubt whether they formed a part of the invoice bill as originally rendered; but it is not deemed necessary to determine this controverted question of fact.

The October consignment, which was insured by the defendants themselves, and was shipped by the steamer Wilmington, reached Mexico safely, and causes no controversy between the parties except as to a portion of the proceeds arising from the sale thereof, which was received by the defendants.

The September consignment, together with similar goods of the value of $169,516, belonging to the complainant, were shipped on the schooner Keese and brig Blonde. The Blonde carried of the consigned goods $10,568.60, and of the complainant's goods $17,250; while the Keese carried of the consigned goods $29,327, and of complainant's goods $152,266.

The goods shipped on both vessels were insured in fourteen separate policies. These policies were made out in the name of Sturm "for account of whom it might concern." The whole amount of insurance on the goods carried by the Blonde was $30,000, while the total insurance on the goods, individual and consigned, carried by the Keese was $163,000. This insurance was effected through an insurance broker, who was informed that the defendants had an interest of about $40,000 in the goods to be covered by the policies, and who was directed to consult Mr. Funke, the member of defendants' firm with whom the complainant had chiefly conducted the transaction in controversy, as to how these policies should be made. This he did, and with the consent and by the direction of Mr. Funke he took the whole lot of insurance together, in the name of complainant "for account of whom it might concern," and appropriated for the benefit of the defendants, and handed over to them by the instruction of the complainant and of Funke, four policies on the cargo of the Keese amounting to $55,000, issued respectively by the Sun, the New York, the Orient, and the Mercantile Insurance Companies; and one policy for $15,000 issued by the United States Lloyds Insurance Company on the cargo of the Blonde. These

four policies on the Keese together with one on the Blonde the insurance broker selected for the defendants at their request, as being issued by good companies, and they were delivered to the defendants about the date of their issuance.

The policies thus delivered to them, as understood by the broker who selected and turned them over to the defendants, were intended to cover their interest in the insured cargoes of the Keese and the Blonde. The amount of the policies so delivered to defendants was in excess of the invoice prices of the consigned goods, for the reason, as alleged, that policies covering the exact amount could not be selected, but with the understanding that the excess was to be held for account of the complainant.

The vessels carrying the cargo sailed for Mexico in September, 1867, a few days after the insurance was effected. On the voyage the Blonde was caught in a storm, and part of her cargo was thrown overboard to save the vessel. The insured goods had to contribute to the general average the sum of $1463.84, which was paid by the complainant, who also paid out the further sum of $672.78 for repairing part of the consigned goods, which reached Mexico in a damaged condition. Half of the amount paid on general average, and the amount paid for repairs upon the consigned goods, are the only items of account in controversy, so far as concerns the shipment made upon the Blonde — nothing having been recovered, either by complainants or defendants, upon the insurance policies taken out on the cargo which she carried. That shipment, except in respect to the items paid on general average and for repairs, may, therefore, be dropped out of further consideration.

The Keese, carrying $29,327 of the consigned goods and $152,266 of complainant's individual goods, and covered by twelve policies of insurance, amounting to $163,000, was wrecked on her voyage without fault or negligence on the part of complainant, and her cargo was totally lost.

The complainant had reached Havana, on his way to Mexico, when he learned of the loss of the Keese and her cargo, and promptly notified the defendants by telegram of the fact. The defendants thereupon called for and received from the com-

plainant's agent in New York City the invoice which accompanied the consignment of September 18, 1867, for the purpose of preparing and making proof of the loss. The insurance companies refused to pay the policies on various grounds, which need not be noticed here.

The complainant returned to New York in March, 1868, and learning that the insurance companies contested their liability for the loss, arranged with the defendants to institute suits against the companies to recover on the policies held by them respectively. The defendants employed Mr. Da Costa to sue upon the policies held by them, while the complainant employed Mr. Parsons to sue upon his, and the lawyers were to coöperate and assist each other in the prosecution of all the suits.

About the time this arrangement was made the complainant opened a bank account with the defendants, and thereafter made deposits with and drew checks and drafts upon them as his bankers down to the latter part of 1875.

The litigation against the insurance companies continued until September 13, 1876, when the last collection upon the policies was made. During the progress of the litigation the complainant turned over, or assigned, to the defendants such judgments as he had obtained, and such policies standing in his name as had not been reduced to judgment, as alleged, for the purpose of convenience in collection and settlement, and with the view of having the amounts collected thereon placed to his credit. The funds collected upon all the policies, amounting to about $109,000, went into the hands of the defendants. The complainant claims that his interest and that of defendants in the amounts recovered is in the ratio of $152,266 to $29,327, that being their relative proportion in the total amount of insurance, and that the defendants ought to account to him according to that proportion, and pay their just share of the expenses incident to the collection thereof, as well as compensate him for his services in connection with the suits. These and other smaller items of account constitute the matters in controversy.

While admitting the general facts in respect to the transac-

tion, the defendants set up in their answer that by the terms of the contract the complainant became the insurer of the goods, and was bound thereby to either sell them in Mexico and account for the proceeds, or to return them to New York free of all expense to the defendants; and that, recognizing such liability, the complainant insured all the goods, making no distinction in the manner of such insurance between his individual goods and the consigned goods; and that the policies transferred to the defendants by the complainant were transferred as collateral security for the performance of the contract, which was upon a gold valuation, and that no part of the policies was held in trust for the complainant.

On this theory the defendants kept their account of the transaction in the name of the "Mexican Arms Account," in which the goods consigned were charged at the price of $39,887.60, and to this was added the premium upon gold at 45 per cent, amounting to $17,949.42; and on the aggregate of these two sums interest was computed from September, 1867, to May 1, 1882, amounting to $53,801.28. This account was also charged with the expenses connected with the suits on the policies turned over to them, amounting with interest to $16,710.72. These expenses consisted of attorneys' fees and sundry outlays for witnesses in connection with the suits. These various items were not charged or entered as debits against Sturm until 1876, when they were transferred from the "Mexican Arms Account" to his account.

The defendants' construction of the contract and method of keeping the account was not communicated to the complainant until some time in 1876, when he promptly denied its correctness. The court below adopted the defendants' interpretation of the contract, holding that the consigned goods were at the risk of complainant; that he was responsible for their loss, although arising from inevitable accident, because he had undertaken to return them if not sold, and that, being so responsible, the defendants had a right to charge him with the value thereof, and treat the policies turned over to them as collateral security for this liability; and were furthermore entitled to charge him with the expenses of collecting such

policies, so that the complainant was entitled to credit only for the net amounts collected thereon. For this and the *f* rther reason — as the court assumed — that the complainant had given testimony in the insurance cases and made admissions under oath which were inconsistent with his present claim, and which should repel him from a court of equity, his bill was dismissed.

If, by the terms of the contract, as embodied in the letters of September 18 and October 24, 1867, the title to the goods vested in the complainant, or they were to be at his risk during their transit to Mexico, then it is conceded that upon an adjustment of the accounts between the parties on that basis — with the allowance to the defendants of a premium of 45 per cent for gold — there is little or nothing due to the complainant, and no substantial error in the decree dismissing his bill; on the other hand, if the title to the goods delivered did not vest in the complainant under the terms of the consignment, or he was not responsible for the loss of the same by inevitable accident, then the court below was in error in dismissing his bill and denying the account sought.

*Mr. John M. Butler* and *Mr. Solomon Claypool,* (with whom was *Mr. William A. Ketcham* on the brief,) for appellant.

*Mr. Albert Baker* and *Mr. William D. Guthrie,* (with whom was *Mr. Clarence A. Seward* on the brief,) for appellees.

I. The bill was properly dismissed for want of equity. The actions against the insurance companies were prosecuted, and the payment of the policies was ultimately compelled, upon the claim that the legal title to the consigned goods was in the complainant Sturm by purchase; that the shipment was at his risk, and that he was liable to the defendants, Hermann Boker & Co., for the invoice value of the consigned goods, payable in gold. If the claim as made in the insurance litigation was true, the complainant concededly and indisputably has no cause of action in this suit. Sturm, in the

course of that litigation, repeatedly swore that he was the owner of, and liable for, the value of the consigned goods; but he now pretends that these oaths were false, and virtually confesses that the New York courts were then deceived and the insurance companies defrauded for the benefit of himself and the defendants.

It must be borne in mind that this perjury in the insurance cases was for the purpose of fastening liability upon the insurance companies, and recovering on the basis of legal ownership and liability, on Sturm's part, for the value in gold of the consigned goods; that this position was vital to the insurance cases as then framed, without which nothing could have been recovered, because he could not have established sufficient insurable interest; and that the parties have succeeded in collecting from the insurance companies on that basis. It matters not from what aspect we look at the bill of complaint herein: whether brought for an accounting of the $109,126.27 collected from the insurance companies, or brought to obtain reimbursement for expenses and payment for services. The money was collected by perjury; the expenses were incurred and the services rendered in the perpetration of a fraud. Even if we assume that the complainant's charge that the defendants participated in this fraud is true, we are, nevertheless, entitled to the benefit of the maxim, "*in pari delicto, potior est conditio defendentis.*" *Dent* v. *Ferguson*, 132 U. S. 50; *Creath's Administrator* v. *Sims*, 5 How. 192; *Wheeler* v. *Sage*, 1 Wall. 518; *Selz* v. *Unna*, 6 Wall. 327; *Kitchen* v. *Rayburn*, 19 Wall. 254; *Bartle* v. *Coleman*, 4 Pet. 184; *Hanauer* v. *Woodruff*, 15 Wall. 439; *Higgins* v. *McCrea*, 116 U. S. 671; *Cragin* v. *Powell*, 128 U. S. 691; *Prince Mf'g Co.* v. *Prince Metallic Paint Co.*, 135 N. Y. 24; *Stephens* v. *Robinson*, 2 Cr. & Jer. 209; *Harmer* v. *Westmacott*, 6 Sim. 284; *De Metton* v. *De Mello*, 12 East, 234; *Post* v. *Marsh*, 16 Ch. D. 395; *In re Great Berlin Steamboat Co.*, 26 Ch. D. 616.

II. The consigned goods, under the original contract between the parties, were shipped at Sturm's risk, and, upon their loss at sea, he was liable to pay for the same at the invoice value thereof.

The legal effect of the agreement to return the consigned goods free of all charges and expenses to the defendants was to make him liable as purchaser in case of failure to return. Such was the practical interpretation acted on by the parties, sworn to by Mr. Sturm in the insurance litigation, acquiesced in for at least nine years. The contract, therefore, as so interpreted and acted upon, was not a bailment, but a conditional sale, with the option to return if not sold. *Moss* v. *Sweet*, 16 Q. B. 493, 494 ; *Martineau* v. *Kitching*, L. R. 7 Q. B. 436, 455 ; *Schlesinger* v. *Stratton*, 9 R. I. 578, 581.

If it be insisted that the title did not pass to the vendee, the intention that the risk should be assumed by him will nevertheless prevail and be given full effect. *Fragano* v. *Long*, 4 B. & C. 219 ; *Castle* v. *Playford*, L. R. 7 Ex. 98 ; *Martineau* v. *Kitching, supra ; Stock* v. *Inglis*, 12 Q. B. D. 564.

The appellant's counsel may urge that the conduct of the parties, until the present litigation, proceeded upon an erroneous construction and misconception of the complainant's legal rights, and that the complainant acted honestly but mistakenly in the insurance litigation. In view of his own testimony in this case, such a claim is preposterous. But, even if there had been no fraud, and the meaning of the original understanding was doubtful, the court would not set aside the practical interpretation of the parties' themselves at the time of the shipment and during the following nine years. If we add to this practical construction, the proceedings, testimony, and arguments in the insurance litigation, the conclusion must be irresistible that the invoice recited truly what had been understood and agreed, namely, that the goods were to be shipped at the risk of Sturm. *Chicago* v. *Sheldon*, 9 Wall. 50 ; *District of Columbia* v. *Gallaher*, 124 U. S. 505 ; *Knox County* v. *Ninth Nat. Bank*, 147 U. S. 91 ; *Topliff* v. *Topliff*, 122 U. S. 121.

III. The Circuit Court properly held that the bill of complaint was based upon an agreement alleged to have been made after the contract of consignment.

Reference to the bill of complaint will show, beyond question, that the claim for expenses and for services rendered is alleged to be based upon an express oral agreement entered

into on the 21st and 27th of March, 1868. The principal, if not practically the only, controversy below was as to this oral agreement. The issue tendered, and which the defendants in coming into court prepared to meet, was this oral agreement as alleged in the bill of complaint. The complainant should not be permitted to change front and to claim upon an implied obligation, after averring an express contract covering the same subject matter. The issue between the parties thus tendered was not that of an implied obligation springing from the original contract of consignment, but (to repeat) an express oral contract to share in the expenses and to pay him for services rendered. The fundamental rule of equity pleading and practice requires relief to be awarded *secundum allegata et probata*, and does not permit a complainant to insist upon relief because the facts, as proved, entitle him to advance some other claim than that alleged in the bill. *Simms* v. *Guthrie*, 9 Cranch, 19; *Carneal* v. *Banks*, 10 Wheat. 181; *Foster* v. *Goddard*, 1 Black, 506; *Harrison* v. *Nixon*, 9 Pet. 483; *Boone* v. *Chiles*, 10 Pet. 177; *Agawam Co.* v. *Jordan*, 7 Wall. 583; *Rubber Co.* v. *Goodyear*, 9 Wall. 788.

MR. JUSTICE JACKSON, after stating the case, delivered the opinion of the court.

It is too clear for discussion or the citation of authorities, that the contract was not a *sale* of the goods by the defendants to Sturm. The terms and conditions under which the goods were delivered to him import only a consignment. The words "consign" and "consigned" employed in the letters were used in their commercial sense, which meant that the property was committed or entrusted to Sturm for care or sale, and did not by any express or fair implication mean the sale by the one or purchase by the other. The words, "Mr. H. Sturm in joint account with Hermann Boker & Co.," or "Bought of Hermann Boker & Co., in joint account," in the bill-head, cannot be allowed to control the express written terms contained in the contract as set forth in the letters. A printed bill-head can have little or no influence in changing

the clear and explicit language of the letters, and it in no way controls, modifies, or alters the terms of the contract. The purpose and object of the bill was to give a description and valuation of the articles to which the contract as embraced in the letters had reference, their description being important if the articles had to be returned, and their price or valuation necessary if they were sold and profits were made for division. The contract being clearly expressed in writing, the printed bill-head of the invoice can, upon no well-settled rule, control, modify, or alter it. That the invoice was not intended to have that effect is shown by the fact that the invoice of the consignment of October 24 differed in several respects from the invoice of September 18, although the terms and conditions in respect to each consignment were the same.

In *Schenck* v. *Saunders*, 13 Gray, 37, 40, there was a written agreement in these terms:

" The said Schenck, Wood & Pond of the first part agree to furnish the stock, consisting of upper and sole leather and linings, and bindings, of sufficient amount to make at least eight, and not to exceed twenty, cases per week. And the said Charles Howe of the second part is to take the stock, and make it up to the best of his abilities into women's boots; and further agrees to consign all the goods he makes to the said Schenck, Wood & Pond of the first part to be sold by them on commission of five per cent, the goods to be sold for cash, and the returns made to the said Charles Howe as fast as made. And the said Charles Howe of the second part agrees to put up and ship to the said Schenck, Wood & Pond, at their store in New York, at least eight cases of boots per week, each case containing sixty pairs, commencing the first week in May, 1856."

With each shipment of leather to Howe, Schenck, Wood & Pond sent him unsigned bills, like those in the present case, in this form:

" Boot, Shoe and Leather Warehouse.
" Mr. Charles Howe,   New York, *May* 15, 1856.
  " Bought of Schenck, Wood & Pond,

".Manufacturers and Commission Merchants, No. 25 Beekman
                        Street.
    " Terms 6 months.
        " 52 sides, sole leather B. A., 644, 26½..... $170 66
        " Inspection and cartage ................         90
                                                     _____
                                               " $171 56 "

In a contest as to the title of these goods, (boots,) between
Schenck, Wood & Pond and an assignee of Howe, it was con-
tended among other things that the invoices showed that the
transaction was a sale to Howe, and the heading of the bills
was relied upon to give such construction to the contract.  The
Supreme Court of Massachusetts, speaking by Bigelow, J., held
that the transaction was not a sale, and that " the bills of par-
cels which were sent from time to time with the merchandise
were susceptible of explanation by parol evidence, and did not
change the terms of the written agreement under which the
property was sent to Howe.  They were sent only as memo-
randa of the amount and value of the merchandise trans-
mitted.  *Hazard* v. *Loring*, 10 Cush. 267."

"An invoice," as said by this court in *Dows* v. *National
Exchange Bank*, 91 U. S. 618, 630, " is not a bill of sale, nor
is it evidence of a sale.  It is a mere detailed statement of the
nature, quantity, and cost or price of the things invoiced, and
it is as appropriate to a bailment as it is to a sale. . . . .
Hence, standing alone, it is never regarded as evidence of
title."

Was the contract, as claimed by counsel for the defendants,
a contract of " sale or return " ?   We think not.  The class of
contracts, known as contracts of " sale or return," exist where
the privilege of purchase or return is not dependent upon the
character or quality of the property sold, but rests entirely
upon the option of the purchaser to retain or return.   In this
class of cases the title passes to the purchaser subject to his
option to return the property within a time specified, or a
reasonable time, and if, before the expiration of such time, or
the exercise of the option given, the property is destroyed,

even by inevitable accident, the buyer is responsible for the price.

The true distinction is pointed out by Wells, J., in *Hunt* v. *Wyman*, 100 Mass. 198, 200, as follows: "An option to purchase if he liked is essentially different from an option to return a purchase if he should not like. In one case the title will not pass until the option is determined; in the other the property passes at once, subject to the right to rescind and return."

The cases cited and relied on by the defendants, *Moss* v. *Sweet*, 16 Q. B. 493, 494; *Martineau* v. *Kitching*, L. R. 7 Q. B. 436, 455; *Schlesinger* v. *Stratton*, 9 R. I. 578, 581, involved contracts of "sale or return," in which there was a sale followed by a destruction of the property before the option of the purchaser had expired or had been exercised. It was properly held in these cases that the goods were at the risk of the purchaser pending the exercise of the option, and that he was responsible for the loss of the goods or the price to be paid therefor. These authorities are not in point in the present case.

The contract under consideration did not confer upon the complainant the privilege of purchasing or returning the goods within any specified or reasonable time, for the defendants retained by express stipulation a right to share in the profits made on the sale of the goods in Mexico, and if they were not sold to have the specific goods returned to them without expense. In the letter of October 24 they specially direct that the Springfield rifles, including those covered by the consignment of September 18, as well as those covered by the consignment of October 24, should be returned if they did not realize the prices indicated in the invoices.

The contract in its terms and conditions meets all the requirements of a bailment. The recognized distinction between bailment and sale is that when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and

the title to the property is changed; the transaction is a sale. This distinction or test of a bailment is recognized by this court in the case of *Powder Co.* v. *Burkhardt,* 97 U. S. 110, 116.

The agency to sell and return the proceeds, or the specific goods if not sold, stands upon precisely the same footing, and does not involve a change of title. An essential incident to trust property is that the trustee or bailee can never make use of it for his own benefit. Nor can it be subjected by his creditors to the payment of his debts.

Testing the present case by these established principles, it admits of no question that the contract was one of bailment, and that the title to the goods, with the corresponding risk attached to ownership, remained with the defendants. Suppose a creditor of Sturm had levied upon or seized these goods after they reached his possession; it cannot be doubted that the defendants could have recovered them as their property.

That the contract between the parties in reference to the goods in question was a bailment upon the terms stated in the letters, is clearly established by the authorities. Among others, see *Hunt* v. *Wyman,* 100 Mass. 198; *Walker* v. *Butterick,* 105 Mass. 237: *Middleton* v. *Stone,* 111 Penn. St. 589.

The complainant's common law responsibility as bailee exempted him from liability for loss of the consigned goods arising from inevitable accident. A bailee may, however, enlarge his legal responsibility by contract, express or fairly implied, and render himself liable for the loss or destruction of the goods committed to his care — the bailment or compensation to be received therefor being a sufficient consideration for such an undertaking.

This brings us to the question whether, by the terms and conditions of the contract, as embraced in the letter of September 18, consigning the goods, it can be held that the complainant assumed such a risk in the present case. He assumed the expenses of transporting the goods to Mexico, the duty of selling them to the best advantage after they reached there, the

obligation to account to the defendants for the price at which they might be sold, less one-half of the profits in excess of the invoice price, and if not sold, he was to return the specific articles to the defendants free of expense. This agreement to return the goods, in the event they should not be sold, it is urged, imposed upon him the risk of their destruction before he had an opportunity to sell or dispose of them under or in accordance with the terms of the consignment. We cannot accede to the correctness of this proposition. The destruction of the goods, without fault or negligence on his part, terminated his obligation to make either a return thereof, or pay for their loss. Such a liability could only be imposed upon him by a contract clearly expressing his assumption of the risk of destruction, or his liability for the loss.

In the case of *Hunt* v. *Wyman*, 100 Mass. 198, the bailee was to return the property (a horse) in as good condition as he received it by a designated time. The property was so injured without fault on his part that it could not be returned within the time agreed upon, and no attempt was made to return it; still it was held that he was not responsible for the property. The court said: "A mere failure to return the horse within the time agreed may be a breach of contract, upon which the plaintiff is entitled to an appropriate remedy; but has no such legal effect as to convert the bailment into a sale. It might be an evidence of a determination by the defendant of his option to purchase. But it would be only evidence. In this case the accident to the horse, before an opportunity was had for trial in order to determine the option, deprives it of all force, even as evidence."

In *Walker* v. *Butterick*, 105 Mass. 237, the following contract was presented:

"BOSTON, *November 25th*, 1868.

"Alexander & Company of the first part are to take goods from Walker & Company of the second part, and to return to them, the said Walker & Company, every thirty days, the amount of sales, at the prices charged by the said Walker & Company, who will furnish Alexander & Company all goods

in their line.   Alexander & Company are worth in real estate and money $5000, of which they hereby certify.

"(Signed)        ALEXANDER & Co.

" We agree to the conditions of the within instrument.

"(Signed)        WALKER & Co."

It appears that some months after the date of this contract, Alexander & Co. absconded, and one of their creditors levied upon goods which had been furnished by Walker & Co.   The court held that the contract under which Walker & Co. claimed title to the goods levied upon, imported a consignment of the goods for sale, and not a sale of them by Walker & Co. to Alexander & Co., so that the title remained in Walker & Co.

In *Middleton* v. *Stone*, 111 Penn. St. 589, A delivered to B two colts, under a contract that B should safely keep and sell them, if possible, before a certain date for A, he fixing a minimum price to be received by him, and in addition thereto one-half of all money obtained above that price to the extent of $25 ; and, if not sold, to return the animals in good condition. Held, that this was not a sale but a bailment, and it was error, therefore, to overrule the offer of B to show that the colts were sick when they were delivered to him; that one of them died, and that he then offered to return the other to A, who refused to receive it.   It was held that the horses were at the risk of A.

It is next urged, on behalf of the defendants, that the taking of the insurance in the name of complainant was a recognition of his responsibility for the loss of the goods, and that the policies of insurance were turned over to them to secure this liability of the complainant.   This position cannot be sustained, for the reason that defendants, through their partner, Funke, directed that all the insurance should be taken out together in the name of Sturm ; and also instructed the insurance broker to select for them the policies which they wished appropriated to secure their interest.   The act of taking out the insurance, in the manner in which it was done, was their act as much as it was the act of Sturm, and the in-

surance having been thus effected in no way tends to establish
the contention that it was a recognition of Sturm's liability
for the loss of the goods.

It is not material to determine whether the complainant
ever endorsed and transferred these four policies to the defend-
ants, or, if so, whether it was done at the time of their deliv-
ery or subsequently, for no such assignment or transfer thereof
was necessary to have enabled the defendants to recover on
the policies for the loss of cargo to the extent of their interest
in the same, it being well settled that under a policy running
to Sturm, " for account of whom it might concern," the de-
fendants could show and recover their interest, in the event of
loss. It was so ruled by this court in *Hooper* v. *Robinson,* 98
U. S. 528, where it was said that " a policy upon a cargo in
the name of A, ' on account of whom it may concern,' or with
other equivalent terms, will inure to the interest of the party
for whom it was intended by A, provided he, at the time of
effecting the insurance, had the requisite authority from such
party, or the latter subsequently adopted it."

In the present case, Sturm had the requisite authority of
the defendants to make the insurance on the consigned goods,
as was testified to by the insurance broker, and as shown in
their letter of September 18, 1867, in which they say : " As
you have insured these goods, as well as other merchandise, we
should be pleased to have the amount of $40,000 transferred
to us." It is clear that the insurance to the extent of $40,000
was intended to cover the interest of the defendants in the
consignment of September 18, 1867, and, in the absence of
any delivery or transfer of policies representing that interest,
this could have been shown by them so as to entitle them to
the benefits of such insurance.

It is next urged, and the court below seems to have taken
the same view of the matter, that the complainant is estopped
from denying his responsibility for the loss of the goods, be-
cause of alleged statements made by him as a witness in the
suits upon the insurance policies. It is claimed that in those
suits he testified under oath that he was the owner of the
goods, and thereby precluded himself from asserting anything

to the contrary in this case, under the wise and salutary doctrine which binds a party to his judicial declarations, and forbids him from subsequently contradicting his statements thus made. We do not controvert the soundness of this general rule as laid down in the cases cited by the defendants. *Dent* v. *Ferguson*, 132 U. S. 50; *Creath's Administrators* v. *Sims*, 5 How. 192; *Wheeler* v. *Sage*, 1 Wall. 518; *Selz* v. *Unna*, 6 Wall. 327; *Kitchen* v. *Rayburn*, 19 Wall. 254; *Bartle* v. *Coleman*, 4 Pet. 184; *Sample* v. *Barnes*, 4 How. 70; *Hanauer* v. *Woodruff*, 15 Wall. 439; *Higgins* v. *McCrea*, 116 U. S. 671; *Cragin* v. *Powell*, 128 U. S. 691; *Prince Mfg. Co.* v. *Prince Metallic Paint Co.*, 135 N. Y. 24; *Stephens* v. *Robinson*, 2 Cr. & Jer. 209; *Harmer* v. *Westmacott*, 6. Sim. 284; *De Metton* v. *De Mello*, 12 East, 234; *Post* v. *Marsh*, 16 Ch. D. 395; *In re Great Berlin Steamboat Co.*, 26 Ch. D. 616. But the question here is whether the statements made by the complainant in the insurance suits bring him within the operation of this wholesome rule? We think not, for it would be pressing his language too far to hold that he made any positive statement to the effect that he was the absolute owner of the goods, or that he admitted as a matter of fact, rather than of opinion, that he was responsible for their loss. What he did state, when his testimony is read as a whole, was that he was the owner *on consignment*, for when the direct question was put to him, "What do you mean by being the owner for the time being?" his reply was, "That they were delivered to me by Hermann Boker & Company under that agreement, and I was responsible for those goods until they were returned, or until I delivered the money to them. This is what I mean." And in reply to another question, he stated that "the terms on which I was the owner were expressed in the papers I furnished," referring to the letters of September 18 and October 24, 1867.

And to the further question whether he understood that those contracts made the goods his property, his answer was, "I understood so at the time, certainly, and I believe so yet."[1]

---

[1] In the trial of the *Great Western* case, Sturm's complaint therein was placed in his hands, and he was asked whether he knew it contained this

This language did not mislead or induce either the defend-
ants or the insurance companies to alter or change their posi-

clause, " that at the time said policy was so effected, and all the time down
to the said loss, the plaintiff was the owner of said cargo?" and he an-
swered, " Yes, sir."

" Question. Was that true ?

" Answer. Yes, sir.

" Q. Was it true in respect to the goods consigned to you by H. B. &
Co.?

" A. Yes, sir."

Asked in the present case whether he so answered in the *Great Western
case*, he answered :

" A. Those questions were put to me and I answered them in that way,
and at the time, by advice of counsel, I was correct."

In the same case he was questioned and made answer as follows, refer-
ring to the Boker goods :

" Q. When did you become the owner of them?

" A. I had the whole responsibility.

" Q. When did you become the owner of the goods?

" A. The moment they were delivered on board the Keese."

In the same case he was questioned and made answer as follows :

" Q. What do you mean by being the owner for the time being?

" A. They were delivered to me by H. B. & Co. under that agreement,
and I was responsible for those goods until they were returned or until I
had delivered the money to them. That is what I mean."

Sturm in 1876, in the trial of the case of *Funke* v. *The New York Mutual*,
referring to the Boker goods, was questioned and made answer as follows :

" Q. Was this entire cargo your property?

" A. I was responsible for the whole of it — in the event of loss I had
to pay for it.

" Q. That is not an answer to my question.

" A. At the time I signed that paper — (paper referred to was his com-
plaint against the Lloyds).

" Q. Was it true, as you swore in those pleadings, that these goods were
all your property?

" A. Yes, I believed that the whole of that property was mine at that
time.

" Q. Were the Boker goods yours which were consigned to you?

" A. That is true; the terms on which I was the owner were expressed
in the papers I furnished.

" Q. Do you understand that that made them your property? — Did you
understand that these letters made these consigned goods your property?

" A. I understood so at the time, certainly, and I believe so yet."

On page 503, Sturm's attention was called to his testimony in this same
case where he testified in 1876 as follows, referring to the September con-
signment from Funke;

tion in any respect whatever, nor influence their conduct in any way. Both the defendants and the insurance companies had the written contracts before them, and were presumed, as a matter of law, to know their legal effect and operation. What the complainant said in his testimony was a statement of opinion upon a question of law, where the facts were equally well known to both parties. Such statements of opinion do not operate as an estoppel. If he had said, in express terms, that by that contract he was responsible for the loss, it would have been, under the circumstances, only the expression of an opinion as to the law of the contract, and not a declaration or admission of a fact, such as would estop him from subsequently taking a different position as to the true interpretation of the written instrument.

In *Brant* v. *Virginia Coal & Iron Co.*, 93 U. S. 326, 337, it was said : " Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel."

So in *Brewster* v. *Striker*, 2 N. Y. 19, and *Norton* v. *Coons*, 6 N. Y. 33, and approved in *Chatfield* v. *Simonson, et al.*, 92 N. Y. 209, 218, where it was ruled " that the assertion of a legal conclusion, where the facts were all stated, did not operate as an estoppel upon the party making such assertion."

In Bigelow on Estoppel (§ 2, pp. 572, 573, 5th ed.) it is properly said : " The rule we apprehend to be this : that where the statement or conduct is not resolvable into a statement of fact, as distinguished from a statement of opinion or of law, and does not amount to a contract, the party making it is not bound, unless he was guilty of clear moral fraud, or unless he stood in a relation of confidence towards him to whom it was made. If the statement, not being contracted to be true, is understood to be opinion, or a conclusion of law from a com-

---

" Question. Did you buy them from him; or were they consigned to you under these two letters?

" Answer. They were consigned to me. I could do with them just as I liked; either pay the money or return them.

" Q. Did you pay Funke anything for them?

" A. I did not."

parison of facts, propositions or the like, and *a fortiori* if it is the declaration of a supposed rule of law, the parties may, with the qualification stated in the last sentence, allege its incorrectness." And again (§ 2, p. 571): " A representation *in pais* in writing, when not a part of a deed or made the subject of a contract, though on oath, is no more efficacious, so far as the question of estoppel is concerned, than a verbal statement."

These authorities lay down the correct rule to be applied in the present case, and, tested by the principle they announce, the complainant is not estopped from claiming his rights under a proper construction of the contract, notwithstanding what he said in the insurance cases.

The grounds of estoppel against the complainant are not nearly so strong as they are against the defendants. It is clearly shown that Funke, a member of defendants' firm, in March, 1876, on the trial of the suit against the New York Mutual Insurance Company upon one of the policies in question, distinctly swore that the complainant was indebted to them only to the extent of $32,000, and that they had *no security whatever* for the payment of that indebtedness. In his testimony in the present case he fails to explain that sworn statement. That sworn statement is inconsistent with the claim now made that the complainant was at that time indebted to the defendants to the amount of over $140,000; and it is furthermore inconsistent with the position now taken that they held all the insurance policies, amounting to $163,000, as collateral security for complainant's indebtedness. These sworn statements of Funke related to facts which were as well, if not better, known to the witness at that time than in 1882, and subsequently, when he testified in this case. These statements are unexplained, and if they do not operate as an estoppel upon the defendants from now claiming a larger indebtedness than was then stated, and from claiming that all the policies were turned over to them as collateral security, they certainly cast suspicion and discredit upon their testimony in the present case. The question of estoppel need not be further discussed.

Upon the written contract, and all the relevant and compe-

tent evidence connected therewith, we are of opinion that the construction which the lower court placed upon the contract was incorrect; that the complainant was not an insurer of the goods; that he was not responsible for their loss; that the policy of $15,000 on the cargo of the Blonde turned over to the defendants was intended to cover their interest in that consignment, amounting to $10,560, and that the four policies on the Keese's cargo delivered to them were to protect their interest in the consigned goods carried by that vessel, to the extent of $29,327; that they held these policies to pay that amount in case of loss, and that the surplus, if any, was to be held in trust for the complainant. But if there were any doubt on this question, Exhibits "H" and "F," which were produced by the complainant during the progress of the suit, place the matter beyond all dispute. Said exhibits are as follows:

"EXHIBIT 'H.'

"MEMORANDUM.              New York, October 11th, 1867.

"We have received from Johnson & Higgins $163,000 policies on the schooner 'Keese' and $30,000 on the brig 'Blonde,' as per statement attached. We directed them to insure our goods for $40,000, which covers our bill of September 18th, and premium, but no profit. To enable us to select our policies, General Sturm has endorsed in blank, five policies, amounting to $70,000, as follows:

MEMORANDUM. [SEAL.]

" On ' Keese' the Orient Mutual $15,000 and New York Mutual $12,500, Sun Mutual $12,500 and Mercantile Mutual $15,000.

" On ' Blonde' the United States Lloyds policy for $15,000 which we have taken as ours. Leaving a balance for us to select on ' Keese' of $25,000 of which we have so far selected only the Orient, and as we cannot divide the policies to suit us we hereby agree this day to keep all the four policies on the ' Keese' for the joint account of ourselves and General H. Sturm, and in case of any accident or loss we will collect the amount of the policies from the companies and pay over to General Sturm his share, viz. : 30–55 of the whole amount collected, and we also agree to pay the premium notes for our share of the policies and to stand all loss, if any should happen to our goods. General Sturm is to bear the shipping expenses only, and in no event shall he be held responsible for any accident or damage, or any act of the Mexican Government; but in case he cannot sell the arms at the price agreed upon and has to return them, he shall insure them for our account.

" The foregoing is hereby fully approved and agreed to.

" HERMAN BOKER & Co."


" EXHIBIT ' F.'

" MEMORANDUM : We have insured our goods on the ' Keese' and ' Blonde' for a maximum of $40,000, which includes the premium, which we have to pay. In case of accident we select our policies and we stand all loss and Gl. Sturm pays shipping expenses only. We hold in trust for Genl. Sturm $30,000 policies on the ' Keese' and also a package of Mexican bonds left over from the $105,000 delivered to us Sept'br. 20th. We also now direct Gl. Sturm to dispose of the batteries at any price.

" Steamer Wilmington, October 25, '67.

" HERMAN BOKER & Co."

These exhibits were vigorously attacked by the defendants, who at first claimed that both the body and signatures of the documents were forgeries. They afterwards admitted that the signatures were genuine, but insisted that the writing above them was forged. A great deal of proof was taken to establish this contention, but it fails, in our opinion, to show that these documents were forgeries. The signatures being genuine, the burden of proof was clearly upon the defendants to establish that the written part above the signatures was forged. The delay in the production of these documents is fairly accounted for by the complainant, and they are in harmony with what, we think, was the true nature and character of the contract and agreement of the parties.

Some reliance is placed upon what is called a statement of his account made to Sturm in Indianapolis in May, 1875, by Boker, one of defendants' firm. This account was clearly a partial one. It was made up by Rabing, the bookkeeper of defendants, not from their books, but from memoranda furnished him by Boker, but from what source he obtained it does not appear. The correctness of the account — shown by loose slips of paper and imperfect memoranda — was disputed by Sturm, and it is now conceded by defendants that it was not a full and accurate statement. Sturm claimed that they had not given him credit for money collected on his insurance policies, and that when they were all included the defendants would be indebted to him. The circumstances attending the presentation of this account, made at a time when Sturm was contemplating going into bankruptcy, tends strongly to show that the defendants were endeavoring to induce him to admit a much larger indebtedness to them than really existed, in order to give them an advantage in the event of bankruptcy. But, however that may be, there was no stated account accepted or acquiesced in by Sturm, such as would either conclude or require him to surcharge and falsify the same.

We have not deemed it necessary to determine whether the September invoice had on it the printed words "payable in gold" when it was delivered. Those words form no part of

the contract as embodied in the letter of September 18, 1867, and complainant's acceptance thereof. They do not impose upon the complainant the liability to account for the value of the goods in gold in the event of loss by inevitable accident; and not being responsible for the goods, nor liable for the loss thereof, neither he, nor the proceeds of his insurance policies, can properly be subjected to the burden of making good either the defendants' loss, or paying such losses in gold. The insurance, as defendants admit, was not on a gold basis, but only for the invoice price of the goods in currency. The complainant was not an insurer, nor in any way liable for even the currency value of the consigned goods, and it would be a perversion of the contract and inequitable to require either him or his policies to compensate the defendants for their loss in gold.

We think the complainant has failed to make out a claim to compensation for his services in attending to the suits against the insurance companies.

In our opinion the complainant is entitled to the account he seeks by his bill, in which he should be credited with the amounts received by the defendants on the insurance policies in the proportion of $152,266 to $29,327, that being their relative interest in the cargo of the Keese; that the expenses of the litigation, including counsel fees, should be divided between the parties on the same basis; that the complainant is entitled to one-half of the sum of $1463.84, paid by way of general average on the goods shipped on the Blonde; to the further sum of $672.68, for repairing the goods which reached Mexico in a damaged condition; and for whatever defendants realized on life insurance policies of the complainant and on the notes arising from the sale of the Indianapolis lots, if the amount so realized did not have to be repaid in taking up the notes; and with such other amounts as he may have placed in the hands of the defendants, either in the bank account or in the transaction connected with the insurance policies; and the defendants will be credited with all the amounts paid to and for the account of complainant not covered by the foregoing rulings. The account will be stated up to the filing of the bill, and any

balance shown in favor of either side will bear interest from that date.

*The decree is reversed, and the cause is remanded to the court below, to be proceeded with in conformity with this opinion.*