RELIANCE COAL & COKE CO. v. H. P. BRYDON & BRO., Inc.

(Circuit Court of Appeals, Sixth Circuit. February 9, 1923.)

No. 3721.

1. Sales ⚖️85(1)—Buyer held not released from taking coal under provision of contract.

A provision of a contract by which defendant agreed to purchase a car per day of coal for one year, to be shipped in monthly installments to a manufacturing company, giving defendant the privilege, in case the manufacturing company could not take all the coal, "to ship part of the same on contract to any of the other Fleischmann plants," held to merely give defendant the option to change destination of shipments, and not to relieve it from its obligation to take the full amount of coal, because the manufacturing company closed down and the other Fleishmann plants could not take it.

2. Sales ⚖️89—Written contract for purchase of coal not modified by conditions printed on order by purchaser for shipments.

Where defendant made a written contract for purchase of coal to be shipped as ordered, which contained the conditions under which it might be relieved from accepting shipments, the fact that an order for shipment sent at the same time the signed contract was returned had printed on the back other and different conditions did not make them a part of the contract, where they were not assented to nor read by the seller.

3. Sales ⚖️153—Repudiation of contract rendered tender unnecessary.

Where defendant contracted for the purchase of coal, to be shipped on its orders, notification of the seller in response to a request for shipping orders that it would take no more coal unless and until a manufacturing plant reopened, and that it would notify seller if it did so, which it never did, held a repudiation of the contract which rendered further tender of shipments unnecessary.

4. Appeal and error ⚖️301—Question of excessive verdict not passed on by trial court not reviewable.

Where the question whether certain items should be considered in estimating damages for breach of contract was not presented to the trial court before submission of the case, and it does not appear that it was considered on motion for new trial, the appellate court cannot reverse the judgment as excessive on the ground that such items were included.

In Error to the District Court of the United States for the Southern District of Ohio; John W. Peck, Judge.

Action at law by H. P. Brydon & Bro., Inc., against the Reliance Coal & Coke Company. Judgment for plaintiff, and defendant brings error. Affirmed.

O. S. Bryant, of Cincinnati, Ohio, and M. H. McLean, of Covington, Ky., for plaintiff in error.

Edward Colston, of Cincinnati, Ohio, and Harry G. Fisher, of Keyser, W. Va. (Harmon, Colston, Goldsmith & Hoadly, of Cincinnati, Ohio, on the brief), for defendant in error.

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. By instrument dated July 3, 1920, plaintiff in error (hereinafter called defendant) contracted with the Logan & Kanawha Coal Company (hereinafter called the Kanawha Company) to purchase approximately one car per day of certain mine run coal for a period of one year from July 1, 1920, at a price therein provided for, delivery to be made in equal monthly quantities. The contract contained this final clause:

"This coal is for the Baltimore Manufacturing Company, Baltimore, Md., and subject to inspection of the first few cars as to quality and preparation. *The Reliance Coal Company has the privilege, in case of embargoes, or if for any other reason the Baltimore Manufacturing Company cannot take all this coal in question, to ship part of same on contract to any of the other Fleischmann plants.*"

The Baltimore Manufacturing Company was a Fleischmann plant. Shipments under this contract were regularly made to the Baltimore Company until about October 16, 1920, from which time and until October 29 (by reason of the shutting down of the Baltimore plant) deliveries were made at defendant's direction to the Fleischmann plant at Langdon, D. C., and after that date until about December 11, 1920, by like direction, to the Fleischmann plant at Peekskill, N. Y., after which date further deliveries were, by defendant's direction, temporarily suspended until further notice should be given by it. Such notice was never given. On April 12, 1921, defendant in error (hereinafter called plaintiff) began this suit to recover damages for the alleged refusal of defendant to accept further shipments, asserting itself to be the undisclosed principal of the Kanawha Company in the making of the contract; also alleging formal assignment to it of the contract by the Kanawha Company on March 9, 1921. Upon the trial defendant contended that the written contract should be interpreted as meaning that, if the Baltimore Company was unable to use the coal, the Kanawha Company was not bound to furnish it, except to some other Fleischmann plant, at the option of defendant, and that defendant was bound to take and pay for (in addition to such coal as the Baltimore Company took) only such as defendant should order shipped to some other Fleischmann plant; that defendant had not refused to perform the contract, but had only declined to accept further shipments until the Baltimore plant should reopen—this suit being begun before such reopening. The trial court rejected defendant's construction of the contract, and left it to the jury to find, as upon facts necessary to recovery, whether the Kanawha Company was plaintiff's agent in the making of the contract, whether plaintiff duly performed it so far as permitted by defendant, whether after the temporary suspension of shipments on December 11, 1920, plaintiff offered to resume shipments, and whether defendant thereupon unequivocally gave plaintiff to understand that it was no longer to be bound by the contract. There were verdict and judgment for plaintiff.

[1] In our opinion the court did not err in rejecting defendant's construction of the contract, and in holding, as matter of law (and as

not a question for the jury), that the fact that the Baltimore Company could not use the coal, and that defendant did not or could not ship to the other Fleischmann plants, would not relieve defendant from its contract or excuse its failure to accept and pay for the coal. The contract was wholly in writing. Its terms were plain and unambiguous. The circumstances of its execution and the negotiations prior thereto were not in substantial dispute. This written contract, including its final clause, which we have quoted, unequivocally imports an absolute liability on defendant to accept all the coal contracted for. Goddard v. Foster, 17 Wall. (84 U. S.) 123, 21 L. Ed. 589. The only option given defendant was to change the destination of shipments. Assuming, for the purposes of this opinion, that defendant would have had such an option without express provision therefor, its inclusion is not significant. Defendant may well have wished to preserve good relations with the seller, and to avoid disputes and misunderstandings possible to arise when market prices greatly advance.

[2] True, on the day on which defendant returned, with its signature, to the Kanawha Company, the formal contract, which had previously been executed by the latter, defendant mailed to the Kanawha Company an order for a shipment of coal, which was received by the latter company on the same day it received the signed contract from defendant; this order containing among the printed conditions on its back the following:

"The Reliance Coal & Coke Company shall not be held liable for failure to accept coal under this agreement, if consignee specified orders shipments held or canceled because of strikes, accident, or other causes; but in that event, however, the Reliance Coal & Coke Company shall have the privilege of furnishing other billing for the uncompleted portion of the order, if they so elect."

But this clause was not called to the attention of the Kanawha Company, and the testimony that it was neither assented to nor read by the Kanawha Company, and was never sent to plaintiff, is undisputed. Plainly this clause was no part of the original contract. It did not purport to be such. The most which can be said in defendant's favor is that it is at variance with plaintiff's interpretation of the written agreement; but the written contract itself must govern. It contains its own exclusive provision for suspension of shipment, which we quote in the margin.[1]

Moreover, the final clause of the contract which we have quoted is a typewritten addition thereto, the words, "This coal is for the Baltimore Manufacturing Company, Baltimore, Md., and subject to inspection of the first few cars as to quality and preparation," being added by the Kanawha Company, and the words immediately following (also typewritten), and which we have italicized, being added by

---

[1] "In case of strikes or accidents inevitably causing stoppage or partial stoppage of the works of the purchaser, delivery herein contracted may, upon request of the purchaser, be suspended or partially suspended during such stoppage, and, the seller shall not be obliged to make up, nor buyer be called upon to receive, any tonnage deficiency created by any of the causes or interruptions herein mentioned, unless by mutual agreement."

defendant. Clearly, the addition printed upon the back of a general form order for shipment cannot prevail against the unequivocal terms of the original contract. Sturm v. Boker, 150 U. S. 312, 326 et seq., 14 Sup. Ct. 99, 37 L. Ed. 1093; Sturtevant Co. v. Fireproof Co., 216 N. Y. 199, 204, 110 N. E. 440, L. R. A. 1916D, 1069.

The verdict of the jury conclusively presumes a finding by it that the Kanawha Company acted as agent for plaintiff in making the contract in suit and had authority to do so. If there was substantial evidence tending to support the finding, it must stand. We are unable to agree with defendant that there was no such evidence. On March 11, 1920, defendant asked plaintiff for quotations on fuel requirements for the Baltimore Company. There was testimony that plaintiff mailed defendant's letter to the Kanawha Company, requesting it to get in touch with defendant in reference thereto. The representative of the Kanawha Company testified that he had plaintiff's authority "to sell the coal to the Reliance * * * Company," and that the "contract was made for that purpose"; that "in all my conversation with Reliance I brought in the question that I was agent for Brydon for the coal, and they absolutely knew it was from Brydon"; that "it was all handled by telephone and correspondence with Brydon prior to the execution of this contract"; that he "did not tell Brydon" that he "wanted to buy coal from them," but that he (the witness) "could contract with these people and that we would take the coal from him" (Brydon); that "the Reliance first offered the contract at $4.50, and Brydon wouldn't take the contract at $4.50, and we later agreed upon a price—that is, $4.50 plus a commission to us. Brydon was to get $4.50, and we were to get 25 cents on a ton." And again: "We had arrangements made with Brydon before the contract was made;" that the witness advised plaintiff on July 6, 1920, that the contract was "practically closed," and that "it will be executed in the next day or two, and we will mail same to you for your signature"; that on July 14, 1920, witness advised plaintiff by letter, "We have executed this contract on basis of $4.75 less 25 cents commission to ourselves;" that plaintiff thereupon signed the original letter of July 14, which, it was said in that letter, "will constitute a contract between our two companies." And again: "It was agreeable to Brydon, prior to that, if we received a price of $4.75, that he would take the coal; that it would be all right with him; that we would execute the contract for Brydon as his agent." It is true that the witness testified that the writing of July 15 was the only "contract" he had with plaintiff; but, considering the testimony as a whole, it was open to the jury to conclude that this meant "written contract." Indeed, the witness once said: "That is the only document I have with Brydon pertaining to this contract."

We conclude that there was substantial evidence tending to support a finding of agency or undisclosed principalship, and that defendant understood that the Kanawha Company was merely acting as broker in the transaction and on behalf of plaintiff. That the trial judge construed the testimony as tending to show agency is shown by his overruling the motion for new trial, one ground of which was

lack of evidence to support the verdict. We see no necessary inconsistency between the claim of undisclosed principalship and the formal assignment of the contract to plaintiff after its alleged breach by defendant.

In view of our conclusion that there was substantial evidence of original agency, defendant was not prejudiced by the admission in evidence of the assignment, whether or not it was admissible for any purpose, as we are disposed to think it was. The court not only did not base plaintiff's right of action upon the assignment, but in the presence of the jury refused plaintiff's request to charge that under the written assignment it had the same right to recover that the Logan & Kanawha Company would have.

[3] We see no merit in the criticism of the charge with respect to tender of shipments and anticipatory breach. Notwithstanding plaintiff's acquiescence in the temporary suspension of shipments, it was not bound to acquiesce in a permanent suspension. The jury was correctly instructed that "if the plaintiff asked permission to resume shipments and defendant told plaintiff that the Baltimore plant was closed, and that it would take no more coal until that plant opened, and that it would let plaintiff know if the plant did open, but never did so, and declined to let plaintiff resume shipments, no further tender of shipment by the plaintiff was necessary," in connection with the charge that "it is essential that it be shown * * * that defendant repudiated its obligation"; that is, that defendant "unequivocally and plainly gave plaintiff to understand, while the contract was in force and effect, that the defendant * * * would no longer be bound by the terms of the contract," and that "a statement by defendant that it would not accept coal because the Baltimore manufacturing plant was closed, and would accept no more coal until and unless that plant opened, persisted in for such a length of time and under such circumstances as to reasonably lead plaintiff to believe that it had repudiated its contract, would amount to such a repudiation." [2]

[4] Defendant complains that the verdict was excessive. By agreement of the parties, the jury was instructed that plaintiff's measure of damages was the difference between the contract price ($5.15 per ton) and what it would have cost plaintiff to produce the coal. The amount of the unaccepted coal to be taken into account under the charge was 5,828 tons. Plaintiff was operating the mine in question under a lease (which expired in September, 1921), at a royalty of 10 cents per ton, with a minimum of $500 per month. It was surface mining, the apex of the "knob" carrying the deposit requiring only the previous stripping of the overlying soil. Each party presented to the jury detailed estimates of the cost of production, that of defendant including, among other items, royalty, cost of stripping and commissions to the Kanawha Company. Plaintiff's computation specially relied upon excluded these three items—the first, because the minimum

---

[2] This instruction was plainly upon the assumption only that the jury found plaintiff to have been the principal and the Kanawha Company its agent.

royalty had to be paid in any event, whether coal was mined or not, the monthly mining never equaling 5,000 tons; the second, because the stripping had been already done (and, its counsel say, paid for) before the final breach occurred.

It appeared that, when the lease expired and was surrendered, there remained 12,000 tons stripped (but not mined), of which plaintiff got no benefit. The verdict was for $12,500. Defendant contends that the maximum permissible recovery would be $3,084.81. If the stripping cost ($1.14 per gross ton) were excluded, and royalty and commissions included, a verdict slightly larger than awarded would be sustainable. Should the stripping be included, the verdict is excessive in any event. Neither party requested instructions respecting any of the items of production cost, nor were such instructions given. The question was first raised, if at all, by motion for new trial, and the grounds of the motion did not specifically embrace excessiveness of verdict. Plaintiff's brief in this court makes this objection. Defendant's counsel say in brief that their calculations were "fully presented on the argument of the motion for new trial, and as strenuously urged as the other points presented in their brief." To this statement plaintiff's counsel makes no response. The motion for new trial was overruled, without written or oral opinion.

We think the question of excessiveness of verdict not properly before us, in view of the facts that before verdict the aid of the court was not invoked respecting the items to be considered, and that it does not appear of record that after verdict the court was definitely requested to consider, or actually did pass upon the question of excessiveness of award. We would not be justified, upon this record, in asserting reversible error in allowing the verdict to stand.

We see no merit in the criticism that each of two witnesses for plaintiff was permitted to give the total cost of production. In the case of one, the ground of objection was not given. On motion to exclude the testimony as to cost, for the reason that the method of arriving at such cost was not shown, examination was had on that subject by the direction of the court. In the case of the other, a detailed statement of the method of arriving at production cost was given, in connection with the statement of the aggregate amount. The witnesses thus did not usurp the functions of the jury. The cost of production was not the ultimate question for the jury's determination; it was but one of the two elements to be considered in determining damage.

The judgment of the District Court is affirmed.