their removal by legal proceedings only. The passage of a resolution authorizing the institution of a suit to compel removal is inconsistent with a purpose to proceed under an earlier resolution to remove by force and without suit. The bill also avers "that, in pursuance of the ordinances and resolutions passed by the board of aldermen of the city of New Decatur, as hereinabove set forth, the said city authorities of the said city intend forthwith and without delay to take steps to force orator to remove its poles and wires from the public streets of said city." The averment is that the removal was to be forced pursuant to the ordinances and resolutions set out in the bill; that is, by filing legal proceedings to compel their removal. No acts or threats of defendant are averred or relied on other than the ordinances and resolutions set out in the bill, as indicating a purpose on its part to resort to violence. Construing the resolutions and ordinances as an entirety, the only action reasonably to be expected to be taken by the town authorities was a suit in court. This case is, therefore, identical with the case of Des Moines City Railway Co., supra; and controlled by it. For the reasons stated, the court is without jurisdiction.

The restraining order heretofore granted is dissolved, and the motion for a temporary injunction is denied; and the bill will be dismissed for want of jurisdiction at the costs of plaintiff, unless amended by the plaintiff within 15 days from the date of this decision, so as to confer jurisdiction within the views expressed herein.

---

In re PENNY & ANDERSON.

(District Court. S. D. New York. December 14, 1909.)

BANKRUPTCY (§ 140*)—PROPERTY VESTING IN TRUSTEE—ATTEMPTED CONSIGNMENT OF GOODS.

Bankrupts conducted a restaurant, and claimants delivered to them a stock of wines and liquors for use therein under an agreement called a "memorandum of consignment," which contained an invoice of the liquors and the prices and provided that they should be considered as delivered on consignment and should remain the property of claimants until the "full indebtedness" of the bankrupts should be paid. There was no restriction on the sale of the liquors by the bankrupts as to price or otherwise and no provision respecting the disposition of the proceeds. *Held*, that the transaction was not a consignment but a sale, and the attempted retention of title in the seller void, as against creditors, and that claimants could not reclaim the property from the trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In Bankruptcy. In the matter of Penny & Anderson, bankrupts. On motion to confirm report of special master dismissing the petition of James M. McCunn & Co. to reclaim goods. Motion granted.

The following is the report of Dexter, Special Master:

On August 19, 1909, a petition in bankruptcy was filed against Penny & Anderson, doing business as restaurant keepers at 152 Columbus avenue, and Mr. Charles P. Sanford was appointed receiver and took possession on the same day. The receiver made an inventory of the stock in the premises (petitioner's Exhibit G), which included a quantity of wines and liquors found in the cellar,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and claimed in this proceeding as the property of McCunn & Co. These goods were not in any way separated from the other wines and liquors stored in the wine cellar, but were used as required in the restaurant upstairs. After the receiver's appointment an arrangement appears to have been made by him with the Lincoln Square Restaurant Company, which in some unexplained way succeeded to the business of the bankrupts, by which wines and liquors as required were withdrawn from the receiver's stock for consumption on the premises, and goods to the value of $94.97 were so withdrawn and paid for (Exhibit D). This arrangement was apparently acquiesced in by the claimant, McCunn; a separate record being kept by the receiver of such withdrawals (page 19). The goods so withdrawn and claimed by McCunn & Co. as their property are enumerated at page 23 as follows:

"Bottle brandy came from McCunn; quart of Medoc on the 5th also from McCunn's; on October 5th there were 3 gallons of bar whisky taken out of Mc-Cunn's stock; there was also a gallon of dry gin taken out. I cannot state the date. It was after the 8th; I should judge 9th or 10th. Also under the same date is a gallon of sherry, gallon of dry gin, gallon of Tom gin; on the same date 2 gallons Private Stock whisky; also gallon brandy, gallon of sherry, one gallon of port wine, gallon of Scotch whisky."

There remains in the possession of the receiver, identified by McCunn & Co. as goods delivered by them to the bankrupts under the agreement hereinafter referred to, the following stock:

"11 bottles old Orkney Scotch whisky, 11 bottles Coleraine Irish whisky, 5 quarts Graves Sauterne, 13 pints Graves Sauterne, 22 quarts Barton Freres claret, 57 pints of same, 36 quarts Barton & Guestier Medoc claret wine, 87 pints of same, 7 quarts Feist Neuersteiner, which is Rhine wine; 25 pints of same; 8 quarts of Pommard Burgundy, 18 pints of same, barrel Quality Club whisky, barrel Private Stock whisky, one-eighth cask, which is a small cask, Octave dry gin; ⅛ cask Tom gin, ⅛ cask Holland gin, ⅛ cask Gromme Rogee & Co. brandy, ⅛ cask pale Imperial sherry, ⅛ cask Crouzarder port, ⅛ cask Strommers Scotch whisky, one 5-gallon demijohn Jamaica rum, 1-5 gallon Santa Croix rum, 1-5 gallon blackberry brandy, 1-5 gallon demijohn Crummack Irish whisky."

On October 15, 1909, James M. McCunn & Co., on petition and affidavits alleging that they claimed title to certain wines and liquors in the receiver's possession, obtained an order from Judge Hough directing the receiver to show cause why the goods in question should not be returned to the petitioner and staying the receiver from selling the same pending decision. Attached to the moving papers are two exhibits, which were produced and offered at the hearing. As they contain the gist of the petitioner's case, they are inserted in full:

### "Memorandum of Consignment.

"This agreement, made the 10th day of June, 1909, by and between James M. McCunn & Co., of No. 98 Pine St., N. Y., party of the first part, and Penny & Anderson of No. 152 Columbus avenue, N. Y. C., party of the second part, witnesseth: Whereas the parties of the second part are about to open a restaurant with a bar at No. 152 Columbus avenue, and whereas the parties of the second part are unable to pay for said goods hereinafter described: 2 bbls. whisky, ⅛ cask sherry, ⅛ cask port, ⅛ cask Holland gin, ⅛ cask Tom gin, ⅛ cask Gordon dry gin, ⅛ cask Scotch whisky, 1 demijohn Irish whisky, 1 demijohn blackberry cordial, ⅛ cask brandy, 1 demijohn St. Croix rum, 1 demijohn Jamaica rum, 1 case special liquer Scotch, 1 case 10 year old Coleraine, 50 bottles St. Julien qts. claret, 100 bottles St. Julien pts. claret, 50 bottles Medoc qts. claret, 100 bottles Medoc pts. claret, 13 bottles Neistien qts. Rhine wine, 25 bottles Neistien pts. Rhine wine, 25 bottles Lubenheimer pts. Rhine wine, 1 case Graaves pts. Sauternes, 1 case Graaves pts. Sauternes, 1 case Pommard qts., 1 case Pommard pts., 3 bar bottles, 4 decanters. The party of the first part agrees to stock the wine cellar of the parties of the second part with following (sic) wines and liquors and in consideration of the foregoing it is agreed by and between the parties that the said wines and liquors shall be considered as placed at the premises of No. 152 Columbus avenue on consignment, and the title in and to said wines and liquors shall always be in the party of the first part until the full indebtedness to the party of the first part

is paid and receipt in full therefor is given. It is further agreed that the value of the said wines and liquors hereby to be delivered under this agreement is $945.55. Signed and witnessed the day of the year above written.

"James M. McCunn & Co.
"Penny & Anderson, Per Anderson."

### Exhibit E

James M. McCunn & Co., Distillers and Importers. 98 Pine Street, New York, June 11, 1909. Sold to Messrs. Penny & Anderson, 152 Columbus Ave., City. Terms: (on consignment). Shipped via ———: "1 bbl. Franklin Club rye, E4234451, 47.50 galls. at $2.30, $109.25 ; 1 bbl. Private Stock rye, E4234450, 48.50 galls. at $3, $145.50 ; ⅛ cask pale Imperial sherry, 22 galls. at $2, $44 ; ⅛ cask Cruzado port, 23.50 galls. at $2, $47 ; ⅛ cask Holland gin, R32505353, 26 galls. at $2.25, $58.50 ; ⅛ cask Old Tom gin, R3250352, 26.50 galls. at $2.25, $59.63 ; ⅛ cask Gordon gin, 101335, 17.50 galls. at $3.25, $56.88 ; ⅛ cask Stromness Scotch, 76748, 26 galls. at $3.60, $93.60 ; 5 galls. Cromac Irish, 62413, 5 galls. at $3.60, $18 ; 5 galls. extra sup. blackberry brandy, 204913, 5 galls. at $1.50, $7.50 ; ⅛ cask Fromy, Rogee & Co. brandy, 76747, 24.50 galls. at $4.95, $121.27 ; 5 galls. St. Croix rum, R2699066, 5 galls. at $3.50, $17.50 ; 5 galls. Jamaica rum, R2699068, 5 galls. at $3.50, $17.50 ; 4 five-gall. box demjs. at $1.25, $5 ; 1 case special liquer Scotch, $14 ; 1 case (10 year old) Coleraine, $14 ; 50 qts. St. Julien (Dom) at $2.30, $9.60 ; 100 pts. St. Julien (Dom) at $3.30, $13.75 ; 50 qts. B & G Medoc at $4.50, $18.75 ; 100 pts. B & G Medoc at $5.50, $22.90 ; 13 qts. Feist Neirsteiner at $5, $5.42 ; 50 qts. Feist Neirsteiner at $6, $12.60 ; 1 case (qts.) Graves at $4.75, $4.75 ; 1 case (pts.) Graves at $5.75 ; 1 case (qts.) Pommard at $11 ; 1 case (pts.) Pommard at $12—$945.65. Three bar bottles, 2 private decanters ; 2 cabinet decanters."

No payments were ever made for these goods, and the petitioner asks that they be returned to him as consigned goods, or, if their return cannot be had, then that he recover the value thereof, $945.55, together with damages for unlawful detention and costs. This is the petition referred to the special master for examination, testimony, and report.

I am of the opinion, and so report, that the petition should be dismissed, for the reason that the inherent character of the attempted consignment was a sale of goods for consumption, with a secret restriction that title should not pass until the goods were paid for, which is inconsistent with the continued ownership of the vendor, and is fraudulent and void as against creditors of the bankrupt. In re Garcewich (C. C. A. N. Y.) 115 Fed. 87, 53 C. C. A. 510, 8 Am. Bankr. Rep. 149 ; In re Wells (D. C. Pa.) 140 Fed. 752, 15 Am. Bankr. Rep. 419 ; In re Hassam (D. C. Vt.) 153 Fed. 932, 18 Am. Bankr. Rep. 745 ; Pontiac Buggy Co. v. Skinner (D. C. N. Y.) 158 Fed. 858, 20 Am. Bankr. Rep. 206.

The only distinction between this and the Garcewich Case appears in the form of the agreement for the delivery of the goods. In the case at bar it is termed "memorandum of consignment," and provides that the goods "shall be considered as placed at the premises of No. 152 Columbus avenue on consignment," and the title shall always be in McCunn until the full indebtedness of Penny & Anderson is paid ; the value of the goods delivered being stated at $945.55. The invoice accompanying the goods contained the words "sold to Messrs. Penny & Anderson, terms, on consignment," and gives the price of each article of the consignment going to make up the aggregate of $945.55.

The debtors were permitted to sell and dispose of the goods as they saw fit and at any price and terms, for consumption on the premises as required in their business. The agreement is silent as to the disposition of the proceeds of sale, but recognizes an indebtedness on the part of Penny & Anderson to be paid before the title vests in them. The petitioner, recognizing this inconsistency, by an amendment to his original petition alleged a further oral agreement that the proceeds of sale were to be kept in a separate fund and that said fund was to be applied upon the purchase price until fully paid. But there is no competent proof of any such agreement. Against the objection of the trustee Mr. McCunn testified (page 43): "We drew up the agreement which has been marked in evidence—a consignment agreement whereby those goods were to be sold and paid for in amounts as Mr. Anderson derived from the sale of the goods."

In other words, the witness merely stated his construction of the agreement. But even if the alleged oral agreement was made it cannot help the petitioner, for the vice in the whole transaction lies in the fact that the goods were delivered for consumption or sale in a way inconsistent with continued ownership of the vendor, and therefore constituted a fraud upon the vendees' creditors.

As is well stated by Judge Archbald (In re Wells, supra): "There is no particular magic in the terms 'consigned' or 'consigned account.' In a sense, all goods shipped to another are consigned to him. The question is: What was the inherent character of the transaction which depends upon the purpose of it? Were the goods put in the hands of the one party by the other to be sold for him and on his account, creating a relation of principal and factor, or were they turned over to such purchaser to be treated and disposed of as his own, being responsible to the other for the price? In the one case we have a trust or bailment, the goods throughout being those of the consignor or principal, as well as the moneys received for them; in the other there is a sale, the superadded condition sometimes appearing that the title shall not pass until the goods are paid for amounting to nothing as a restriction upon it." In the above case the petition for the return of the goods was dismissed.

The transaction in question did not create the relations of principal and factor, for a factor cannot make a profit of his agency nor a valid purchase for himself and receives a commission for his services. A. & E. Ency. Law, vol. 12, at pages 628, 644. If it were claimed to be a warehousing contract, it would be void against creditors because there was no change of possession continuous or otherwise, nor any real separation from other goods belonging to the bankrupts. Security Warehousing Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117. If it were claimed to be a chattel mortgage, it would be void for nonfiling as against the trustee under the rule laid down in Skilton v. Codington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885, disapproving the earlier case (In re Economical Printing Co., 110 Fed. 514, 49 C. C. A. 133, 6 Am. Bankr. Rep. 615), which can no longer be cited as authority for the contrary proposition. And if it were claimed to be a conditional sale it would be void as against creditors under the rule laid down in Re Garcewich, 115 Fed. 87, 53 C. C. A. 510, 8 Am. Bankr. Rep. 149.

The authorities in other districts are not uniform on this question, depending to a great degree on the varying state statutes. The case of In re Fabian (D. C.) 151 Fed. 949, 18 Am. Bankr. Rep. 488, in the Eastern district of Pennsylvania, is relied upon as controverting the proposition above stated. In that case the vendors agreed to ship to the bankrupt "from time to time certain goods to be sold for their account as per schedules to be delivered at time of shipments, and all such goods to remain the property of (the vendors) until sold for their account." The nature of the goods is not disclosed. Provision was made for guaranteed weekly averages and a regular accounting and adjustment between sales and remittances. The court considered the case within the decision of the United States Supreme Court (York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782) and sustained the contract in favor of the vendors.

As to the York Manufacturing Company Case and others depending on it, the conflict with the Garcewich Case and the cases depending on it is only apparent. Machinery, fixtures, and merchandise may be the subjects of conditional sale, and the court will protect the claim of the conditional vendor as against the trustee who takes the property in cases unaffected by fraud subject to all equities impressed upon it in the hands of the bankrupt. Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577. But where there is fraud, actual or constructive, the cases rest upon a different reasoning. Thus, in the Security Warehousing Case, supra, the Supreme Court, after reviewing the York Manufacturing Company Case and others, held: "The case at bar bears no resemblance in its facts to the case just cited. There was no valid disposition of the property in the case before us or any valid lien. The so-called warehouse receipts, issued by the warehousing company, upon the facts of this case give no lien under the law in Wisconsin, in which state they were issued. In such case this court follows the state court."

In the Garcewich Case the Circuit Court of Appeals of the Second circuit rests its decision flatly on the fraudulent nature of the conditional sale. "We think that the court below erred in viewing the case as one in which there had

been a valid conditional sale good as against creditors. If the sale had been of that character, we think the decision would have been correct, but, being a fraudulent one, it was void as to the trustee." So in Re Hassam, supra, Judge Martin, of Vermont, says: "It has been repeatedly held that when personal property is delivered to a vendee for sale or to be dealt with in a way inconsistent with the ownership of the seller, or so as to destroy his lien or right of property, the transaction cannot be upheld as a conditional sale and is a fraud upon the creditors of the vendee. [Citing cases.] In no case decided by the Supreme Court to which my attention has been called has the court upheld secret liens or mortgages upon goods designed for sale or so tainted by fraud as to creditors as this case appears to be."

Unless there be "some particular magic in the term consigned" which is not made to appear in the discussion of the cases, I must conclude that the form of the transaction is immaterial. The court will look at the substance of the transaction, and if tainted with constructive fraud, as in this case, will construe it according to its real purpose.

I therefore find and report that the petitioner is not entitled to recover of the trustee the goods in question nor the proceeds thereof so far as sold, and that his petition should be dismissed, with costs.

Lesser Bros. (William Lesser, of counsel), for the motion.
Wait & Foster (Charles C. Bunker, of counsel), opposed.

HOUGH, District Judge. Motion granted. Report confirmed.

---

## LUDVIGH v. AMERICAN WOOLEN CO. et al.

(District Court, S. D. New York. January, 1910.)

1. BANKRUPTCY (§ 140*)—SUIT BY TRUSTEE TO RECOVER PROPERTY—TITLE OF BANKRUPT—SALE OR BAILMENT.

Bankrupts were dealers in silk and woolen goods, buying the latter largely from the American Woolen Company. Some two years prior to the bankruptcy, at the instance of the Woolen Company, the Niagara Woolen Company was organized, and two shares of stock were taken by the Woolen Company to qualify two of its employés for directors; practically all the remaining stock being issued to one of the bankrupts, who executed a mortgage on real estate to secure payment therefor. The Niagara Company was controlled by the Woolen Company, and its charter authorized it only to contract and deal with the Woolen Company and deal in fabrics received therefrom. It at once made a contract with the Woolen Company which bound it to receive whatever goods the latter should see fit to furnish, sell the same, and collect and pay the proceeds to the Woolen Company, less the difference between the selling and invoice prices; the goods to remain until sold the property of the Woolen Company. Such goods as it did not sell or collect pay for it was bound to account and pay for to the Woolen Company at invoice price, and to secure performance of such contract in all its parts one of the bankrupts pledged all of his stock to pay for which he had given the mortgage. The Niagara Company had no working capital. A small office was railed off for it in the bankrupt's store where it kept a bookkeeper, furnished by the Woolen Company, an additional sign with its name thereon was placed on the store front, and its goods were received in such store, mingled with the goods of the bankrupts, and sold by their salesmen with their own goods under an arrangement that bankrupts were to receive a certain sum per month for the service from the "earnings" of the Niagara Company. Shortly before the bankruptcy, the bankrupts being insolvent, the Woolen Company removed from their store all the remaining goods furnished by it under the contract. *Held*, that the organization of such paper corpora-