## LUDVIGH v. AMERICAN WOOLEN CO. et al.

(District Court, S. D. New York. January, 1910.)

1. BANKRUPTCY (§ 140*)—SUIT BY TRUSTEE TO RECOVER PROPERTY—TITLE OF BANKRUPT—SALE OR BAILMENT.

Bankrupts were dealers in silk and woolen goods, buying the latter largely from the American Woolen Company. Some two years prior to the bankruptcy, at the instance of the Woolen Company, the Niagara Woolen Company was organized, and two shares of stock were taken by the Woolen Company to qualify two of its employés for directors; practically all the remaining stock being issued to one of the bankrupts, who executed a mortgage on real estate to secure payment therefor. The Niagara Company was controlled by the Woolen Company, and its charter authorized it only to contract and deal with the Woolen Company and deal in fabrics received therefrom. It at once made a contract with the Woolen Company which bound it to receive whatever goods the latter should see fit to furnish, sell the same, and collect and pay the proceeds to the Woolen Company, less the difference between the selling and invoice prices; the goods to remain until sold the property of the Woolen Company. Such goods as it did not sell or collect pay for it was bound to account and pay for to the Woolen Company at invoice price, and to secure performance of such contract in all its parts one of the bankrupts pledged all of his stock to pay for which he had given the mortgage. The Niagara Company had no working capital. A small office was railed off for it in the bankrupt's store where it kept a bookkeeper, furnished by the Woolen Company, an additional sign with its name thereon was placed on the store front, and its goods were received in such store, mingled with the goods of the bankrupts, and sold by their salesmen with their own goods under an arrangement that bankrupts were to receive a certain sum per month for the service from the "earnings" of the Niagara Company. Shortly before the bankruptcy, the bankrupts being insolvent, the Woolen Company removed from their store all the remaining goods furnished by it under the contract. *Held*, that the organization of such paper corpora-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
176 F.—10

tion was merely a device on the part of the Woolen Company to secure itself against loss in respect to goods which it in fact sold to the bankrupts; that since under the arrangement the bankrupts were ultimately liable for the price of the goods, whether they sold the same or not, and without right to return them, the transaction was not a bailment or consignment, but a sale by which title to the goods passed to the bankrupts and from them to their trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

2. SALES (§ 4*)—DISTINGUISHED FROM BAILMENT.

One to whom goods are delivered, which he not only may sell, but must pay for whether he sells them or not, and which he cannot return, is not a bailee, but a purchaser.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 7–11; Dec. Dig. § 4.*]

In Equity. Suit by Clifford G. Ludvigh, trustee in bankruptcy of P. Horowitz & Son, against American Woolen Company and Niagara Woolen Company. On final hearing. Decree for complainant.

See, also, 159 Fed. 796.

Abram I. Elkus, Garrard Glenn, and James N. Rosenberg, for complainant.

Daniel P. Hays and Ralph Wolf, for defendants.

HOUGH, District Judge. Prior to 1901, and thereafter until the fall of 1904, Philip and Joseph Horowitz (father and son) constituted the firm of P. Horowitz & Son, which firm (and its members) became bankrupt on January 26, 1905. Complainant, as trustee for the firm of its members, brings this suit to recover the value of certain merchandise physically removed from the bankrupts' place of business by the defendants shortly before the filing of the involuntary petition herein. The bill of complaint also demands an accounting for certain moneys alleged to have been transferred shortly before petition by the bankrupt partnership to the defendant Niagara Woolen Company (hereinafter called "Niagara Company"). This claim was not pressed at the hearing, for reasons sufficiently apparent from the facts to be stated. The Horowitz firm had been engaged in the purchase and sale of silk and woolen goods for some time before the organization of the American Woolen Company (hereinafter called "Woolen Company") in 1901. The partners had been accustomed to buy (probably) much more than half their woolen goods from firms and corporations which became merged in the Woolen Company on the formation thereof.

From his appearance on the witness stand Joseph Horowitz must have been a very young man in 1901, and it is quite evident that as long as the firm lasted the controlling spirit thereof was (naturally) the father, Philip. Before organization of the Woolen Company, Horowitz & Son had at times, if not steadily, carried a line of woolens averaging $40,000. After the formation (but how long after does not appear) of the Woolen Company, and on November 15, 1901, an agreement was entered into between Horowitz & Son and the Woolen Company by which: (1) Horowitz agreed to accept goods "on consignment" from the Woolen Company, and in consideration of such con-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

signment further agreed to "consider any and all shipments of merchandise as consigned, whether billed to that effect" or not. (2) The title to such consigned merchandise "or its proceeds" was always to be vested in the Woolen Company "until said merchandise is fully accounted for." (3) Horowitz agreed "to make all bills of such consigned goods payable to" the Woolen Company and to render "an account of sales" to the Woolen Company at least once a month. (4) Horowitz was also to give real estate security to protect the Woolen Company from any failure to "observe this consignment contract in its entirety." (5) Horowitz's profits were stipulated to be "the difference between the invoice prices and the selling prices" of the consigned goods. (6) The "basis of terms" to Horowitz was to be 7 per cent. discount for four months, and any increase in profits by varying these terms to the trade was to go to Horowitz. (7) The Horowitzs were to have a drawing account of $1,200 a month, the same to be charged to profit account "provided the sales of goods made by P. Horowitz & Son shall warrant such payment."

This agreement was to extend until December 1, 1902, and during its continuance Horowitz was to "buy woolens" from no one except the Woolen Company. How closely this agreement was adhered to does not appear from the evidence, except that under it sales were made in the name of Horowitz & Son and bills for such sales sent to customers bearing a prominently printed legend in red ink to the effect that the amount was payable direct to the Woolen Company. The goods thus obtained by Horowitz continued to represent a stock of about $40,000.

It is obvious that this business arrangement was an endeavor on the part of the Woolen Company to retain title to all goods delivered to Horowitz, and to make all persons buying such goods through Horowitz debtors of the Woolen Company; but there is nothing in the agreement requiring Horowitz at any time to take and pay for such of the goods as were not sold. The requirement was to "account" for goods in January and July, but for all that appears from the agreement produced or the evidence herein goods were sufficiently accounted for by showing them on hand. As the term of the agreement of 1901 approached its end, the Woolen Company, for reasons not shown in the evidence, decided upon a different method of doing business with Horowitz, which method is expressed in divers agreements dated November 25, 1902, and in evidence. As to what occurred at this time, the actors in such occurrences and their relation to each other, there is no conflict of evidence, and it is sufficient for the purposes of this cause to state only my ultimate conclusions thereon. Both the elder and younger Horowitz were entirely under the control of the Woolen Company, so far as obtaining and marketing the product of that company was concerned. What they did was done on the order of the Woolen Company. For all that appears they were entirely willing to obey orders, but they either had to obey orders or forego much if not most of their business. Therefore, unders orders from the Woolen Company, they contributed $300 and the Woolen Company $200 toward the capital stock of the then incorporated Niagara Company. The $500 thus obtained allowed the issue of five full paid shares of the capital stock of the newly formed corporation, and with said $500 the cor-

poration itself paid the fees and expenses of the Woolen Company's counsel in and about the incorporation of the Niagara Company. The balance of the authorized capital stock ($20,000) of the Niagara Company was issued in consideration of the assignment or execution to the Niagara Company of a mortgage for the proper amount made by Philip Horowitz on certain real estate owned by him. (This was the same real estate which had been used to secure the performance of the "consignment agreement" of 1901.)

The Niagara Company then had on paper a fully paid in capital stock, of which Philip Horowitz owned 197 shares, and the remaining 3 shares were distributed between his son and the two employés of the Woolen Company, who immediately became the directors of the Niagara Company. The sole business of that company, as revealed by its articles of association, was "to contract and deal with the American Woolen Company of New York and to deal in fabrics received therefrom." There was also charter power to acquire real estate, or mortgages thereon, not exceeding $20,000 at any one time; but this right was, under the evidence, plainly to be used only in validating the issuance of capital stock in the manner above set forth. The Niagara Company, having been thus formed with the limited powers above indicated and officered in such a manner as to insure its control by the Woolen Company, executed a contract with the Woolen Company dated November 25, 1902, whereby the Woolen Company agreed: (1) To deliver to the Niagara Company such goods "as it in its judgment sees fit." (2) The Niagara Company agreed to accept such goods, to hold them as the property of the Woolen Company and in such wise that "the title to the said (goods) shall pass directly from the (Woolen Company) to persons to whom the same shall be sold * * * in the manner and upon the terms herein contained." (3) To keep the goods aforesaid insured in the name of the Woolen Company (whether this was ever done does not appear—it was not done regularly). (4) To "sell the goods" to persons selected by it (Niagara Company) and to collect all bills for such sales and "immediately to pay over to (Woolen Company) any amount (so) collected immediately upon its collection," minus the difference between the invoice price to the Niagara Company and the sale price fixed and collected by said company (clause 4). (5) To guarantee payment of all bills for merchandise so sold, and "in case any merchandise delivered under the provisions of this agreement by (Woolen Company to Niagara Company) is not accounted for to (Woolen Company) under the provisions of clause 4 of this agreement to pay (Woolen Company) the invoice price of said merchandise."

It is to be observed that this document requires the Niagara Company to pay the invoice price of the merchandise delivered to it unless it accounts for the same "under the provisions of clause 4"; but clause 4 contains, as above set forth, a specific agreement on the part of the Niagara Company to sell the merchandise and pay over to the Woolen Company the sale price thereof, less the difference between such price and the invoice value. It follows that if the Niagara Company could not account to the Woolen Company for money by selling the goods it was nevertheless bound to pay the invoice price and (continues the written agreement) "thereupon title to said merchandise * * * so

paid for shall pass to" the Woolen Company. It was further provided
(6) that the invoices given by the Woolen Company to Niagara Compa-
ny "are to be subject to the usual trade discounts" of the Woolen Com-
pany. Contemporaneously with the execution and delivery of this
agreement between the two corporations the members of the bankrupt
firm executed an agreement of suretyship to the Woolen Company "for
the full and faithful performance" of the contract just mentioned on
the part of the Niagara Company. By this agreement the partners
guaranteed to the Woolen Company "the full and faithful performance
of any and all conditions imposed on the Niagara Company" by said
contract, and as further security for faithful performance the elder
Horowitz transferred his 197 shares of the Niagara Company to an
officer or agent of the Woolen Company. These two agreements of
November 25, 1902, were to endure for a year, but on November 17,
1903, were continued in force (with some modifications) to December
1, 1904. The modifications related only to the discounts to be allowed
the Niagara Company, provided it turn over to the Woolen Company
the invoice value of goods delivered to it "within sixty days (of the
sale thereof) by the Niagara Company."

The Niagara Company, having thus a legal existence, full-paid cap-
ital stock and a means of getting goods from the Woolen Company,
made the younger Horowitz (Joseph) its president, but in by-laws at
once adopted limited the president's powers so that he was not author-
ized "to make contracts for the purchase of merchandise from any
other person, individual, firm or corporation than the American Wool-
en Company of New York." Thus far Niagara Company had no
quick assets and no working capital. Regarded as a separate corpora-
tion, it had no machinery at all for carrying on a mercantile business.
Obviously there must be some means provided for doing this, and it
was accomplished by acting upon a communication from Philip Horo-
witz received at an adjourned meeting of the Niagara's incorporators
held at the offices of the Woolen Company on November 25, 1902.
Mr. Horowitz offered in writing "to pay all the expenses of doing busi-
ness for the Niagara Woolen Company in consideration of the sum of
$1,200 monthly, to be paid out of the earnings of the corporation."
This offer was accepted, and thereafter and until the early summer of
1904 Philip Horowitz was paid this monthly amount usually if not
with regularity.

If the documents submitted in evidence and the scheme thereby un-
folded have been understood, it is manifest that the result thereof, if
adhered to and recognized as lawful, was to enable the Woolen Com-
pany to send to the Niagara Company as great or as small a quantity
of goods as it desired. Such is the express language of the agreement.
There was no limit to the Niagara Company's obligation to receive
goods from the Woolen Company, but the latter corporation was not
bound to deliver any goods at all. Merchandise once delivered on
consignment to the Niagara Company could be sold by the latter, and
any advance over invoice price or value retained, and it is evidently
by such sales at advanced prices only that the Niagara Company could
make any earnings whatever. If the goods were not sold, or were sold
at a loss or to persons who did not pay, it was nevertheless plainly in-

cumbent upon the Niagara to pay to the Woolen Company the invoice price. The expenses of this business were to be paid by Philip Horowitz, and his obligation in form was to pay all the Niagara's expenses, no matter what they were, in consideration of $1,200 a month out of the "earnings" of that concern. If there were no earnings, he had no claim to this monthly payment; but his obligation to pay the expenses of the business remained in force. It was further incumbent upon the Horowitz firm to make good every obligation of the Niagara Company to the Woolen Company, i. e., not only were all sales guaranteed, but ultimate settlement with the Woolen Company on the basis of invoice price for all goods delivered was likewise covered, and to the performance of these onerous obligations the elder Horowitz had pledged substantially all the capital stock of the Niagara Company, which in turn represented a foreclosable interest in his personal real estate.

The mere statement of this paper scheme seems to me to show its unworkable nature. Perpetual business sunshine was essential for its continuance even from day to day. It therefore becomes interesting and material to consider the evidence of what was actually done under agreements stated, between November, 1902, and October, 1904. On this subject the testimony of Joseph Horowitz seems to me frank and honest, though given under circumstances very painful to any son of Philip Horowitz. It was Joseph to whom was given the first intimation that the Woolen Company desired to put into effect any such scheme as this just outlined, and the way it was put to him (by an agent of the Woolen Company) was that his firm must incorporate. Doubtless the details of the plan were not present in the mind of the agent who spoke, but as arranged by that company's counsel it was the apparatus of the Niagara Woolen Company of which Joseph was given notice by the language above substantially quoted.

In response to inquiry he was at the same time told that business would go on as before, and it did go on as follows: Joseph, as president of the Niagara Company, went from time to time to salesmen of the Woolen Company. He advised them of what he wanted, and in due time received a memorandum of order specifying the quantity, quality, and price of the goods to be sent to the Niagara Company "in accordance with agreement had between us as of November 25, 1902." In due time also a manifest or "copy of order" was sent to the Niagara Company, in which the time of delivery was stated, and the terms (of so much per cent. off for payment within specified periods) were given, as in ordinary bills rendered. The copy of order also stated that:

"These goods are delivered on consignment by (Woolen Company) and accepted by (Niagara Company) upon the express condition that the title thereto remains vested in (Woolen Company) until paid for."

The goods thus ordered and billed were usually sent to the Horowitz place of business, but in some instances they remained in the Woolen Company's store or warehouse until wanted.

Obviously, as to goods delivered at Horowitz's place, some means of connecting them with the Niagara were desirable, and, accordingly, a sign reading "Niagara Woolen Company" was appended to the sign of Horowitz & Son displayed outside the door of the latter's establish-

ment. This sign seems to have been reasonably conspicuous. In the back part of the store a stall or partition about 10 feet square was boarded off, and there a set of books was kept in which were entered all goods received from the Woolen Company and all sales of such goods as reported by the Horowitz salesmen, for the Niagara Company never at any time had a sales department of its own.

The goods thus delivered by the Woolen Company bore tags which (if not removed) would serve to indicate their origin; but they were so mingled with other goods, both woolens and silks, obtained by Horowitz from divers sources, that there was nothing in the arrangement of goods in Horowitz's store to indicate that any particular goods were the property either of the Woolen Company or of the Niagara Company, or not the property of Horowitz. The books last referred to were at first kept by employés of Horowitz, but were so badly kept that in July, 1903, the Woolen Company, at its own expense, installed in the room or stall above described a bookkeeper, who thereafter kept accurate record of such goods as were billed and of such sales and payments as were reported to him through Horowitz. The volume of business thus done in Woolen Company goods remained at least up to normal standards (an average line of $40,000), and at times evidently exceeded that figure. In selling goods Horowitz and his clerks made no discrimination between Woolen Company goods and other goods. All were offered alike, and all customers were solicited through Horowitz; but when bills were rendered (at least as long as Joseph Horowitz was president of the Niagara Company) such bills for Woolen Company goods were in the name of the Niagara Company only. It sometimes occurred that, when merchandise was sold in mixed lots (some from "consigned" goods and some from Horowitz's own stock) to the same customer, a check came in payable to Horowitz & Son only. This check was deposited and a cross-check drawn in favor of the Niagara Company. All checks drawn to the Niagara's order were (under Joseph Horowitz's presidency) deposited in a separate bank account in the name of the Niagara Company. The business thus conducted was visited almost daily by the secretary and treasurer of the Niagara Company (a clerk of the Woolen Company), whose duties consisted in examining the sales book, and with the co-signature of Joseph Horowitz taking out of the Niagara Company's bank account as much money as the account would stand without undue depletion.

After the payment of attorney's fees for the formation of the Niagara Company, the only checks ever drawn out of its bank account were either in favor of the Woolen Company or in favor of Philip Horowitz for the $1,200 a month above alluded to. No dividends were paid on the Niagara's stock nor are any earnings of that company shown in excess of said $1,200 per month, while in the early summer of 1904 these payments were stopped because, in the opinion of the secretary and treasurer, the "earnings did not warrant" them.

In 1903 Joseph Horowitz objected that the terms of discount permitted by the Woolen Company were not sufficiently generous. He laid his claim before the proper agents of the Woolen Company and finally received a memorandum (in evidence), from which it would ap-

pear that substantially what Joseph had requested was to be granted to the "credit P. H. & Son." In December, 1903, Joseph Horowitz desired to have certain of the consigned goods taken back by the Woolen Company, but was informed that that company could not consent "to have thrown back into our stock fall goods which were made expressly for you and delivered in accordance with the terms of the agreement" —"you" meaning Niagara Woolen Company. Specific agreements were made to the effect that "off-price" goods which had been ordered by Joseph Horowitz, as president, would be taken back by the Woolen Company, provided that that company was saved harmless from all loss by such sending back of goods.

There is nothing in the oral evidence to persuade me that down to about May, 1904, there was any departure from either the letter or the spirit of.the written agreements first above set forth. The result was that, if the Horowitz firm could not sell and collect for enough goods in a month to show $1,200 of "earnings" by the Niagara Company, they got no contribution from the major portion of their business toward the payment of their rent, their clerk hire, and their personal expenses. Yet they had nothing upon which they could honestly borrow. Joseph Horowitz deposes that he, accordingly, found the burden more than he could bear, resigned the presidency of the Niagara Woolen Company, and entered into a business of his own, not formally retiring from his father's firm, but after about May 1, 1904, having nothing to do therewith and rarely visiting the place of business. Philip Horowitz succeeded his son as president of the Niagara Woolen Company, and shortly entered upon the series of dishonest transactions which have ultimately produced this litigation. Instead of indorsing checks drawn ·to the order of the Niagara Woolen Company for deposit and thereafter putting them in the bank account of that corporation, he (as president) indorsed them in blank and thereafter deposited them in his own bank account and appropriated the proceeds to his own use—of course keeping these transactions concealed from the Woolen Company's bookkeeper in his own place of business and from the visiting secretary and treasurer. This lasted for several months, until a fire occurred in his place of business under circumstances so suspicious that an investigation was entered upon, pending which the petition in bankruptcy herein was filed, whereupon Philip Horowitz fled the jurisdiction, and has not since been seen nor heard of by any party to this litigation (so far as appears) nor by his own son.

Upon the discovery of Philip Horowitz's dishonesty and probable insolvency, the defendants herein removed from Horowitz's store all consigned goods then on hand (said to amount to over $33,000), and for an accounting as to the same this action is brought. The bill of complaint correctly alleges the main features of the plan above set forth, but it also asserts (in substance) that with the knowledge and connivance of the defendants, and especially of the officers and agents of the Woolen Company, Horowitz & Son sold the "consigned goods in their own name and rendered bills in their own name and made collections accordingly," and that in most instances the proceeds of such sales were placed by the bankrupts "in their own bank account," so that in effect the bill charges that, however legally good inter partes

the paper scheme was, it was also from the beginning, or nearly so, practically disregarded, and is now used, and was always intended to be used, only as a protection in time of need; while ordinarily the Horowitz firm with the knowledge and consent of the Woolen Company transacted their business, sold goods, and made collections therefor exactly as if they had bought all the goods in their store for cash or credit in the ordinary way. This, as above sufficiently indicated, I do not believe to be true. There is no evidence of any actual fraud on the part of the Woolen Company; on the contrary, the evidence is clear that that corporation, acting under advice of counsel, perfected this plan in order to avoid suspected dangers in doing business with Philip Horowitz. The plan was believed to be lawful, and was honestly adhered to until within a short time of failure, when Philip Horowitz more than justified suspicion by flagrantly violating his own agreements and becoming a fugitive from his creditors. This makes the case presented for decision on the evidence quite different from that before the court on demurrer, but the bill is broad enough to fairly cover the claim now put forward by the trustee.

## Decision.

Complainant's present position may be thus stated from the bill. which avers that by reason of the premises the "stock of goods delivered by said American Woolen Company and maintained at the said place of business of the bankrupts became and remained the property of the latter in so far as the rights of all the latter's creditors * * * are affected or in any way concerned." This is an assertion that the removed goods belonged in the eye of the law to the bankrupts, and therefore belong to their trustee, and that this case is brought to remove from said goods or their value the incumbrance created by the creation of the Niagara Company and the apparatus of contracts above recited. It may be admitted, and is found, that there was no actual fraud on the part of any one, in the sense either of suppression of truth or suggestion of falsehood practiced upon creditors. The existence and powers of the Niagara Company were matters of record, its presence at Horowitz's store was advertised by a sign, and any one might examine the form of bill rendered for many (if not most) of the sales made by Horowitz. Yet if the entire scheme as revealed by the agreements entered into or the conduct of the parties thereunder or both constitute a transaction fraudulent as matter of law," the good faith of all parties cannot avail as against creditors, and a trustee in bankruptcy is a proper party complainant to assert the creditors' rights. Skilton v. Codington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885.

Nor does it advance the matter to point out that the arrangements complained of were valid and lawful inter partes. That is admitted; but so are most conveyances actively fraudulent as against creditors. Neither is it important to dwell much upon the method of doing business under the contracts and agreements made. It often happens that what contracting parties do, how they deal with each other, after contract made, more clearly shows what they really intended to do than the written instruments by which they concealed rather than revealed their purposes. In this case about the only light cast on the parties' writing

by their acts makes the court certain that it was never intended by the Woolen Company to ship or deliver to Niagara Company more merchandise than Horowitz ordered, and he ordered only what he hoped to dispose of in what all parties regarded as his business. The presidency of the Niagara Company was thought of only as a part of the plan ordained by the Woolen Company, which was the only method by which Horowitz & Son could provide themselves with goods, and the plan itself was deemed but a legal substitute for the consignment agreement of 1901, as to which the Woolen Company's counsel had grown doubtful, while Horowitz thought of nothing but getting the goods and selling them at a profit which he could keep.

Let this matter, therefore, be tested by the written contracts. From them alone it is apparent that in substance and effect Horowitz & Son were obliged to pay the invoice price for every yard of goods delivered to the Niagara Company sooner or later, whether the merchandise was sold or not, and even if it were burned or stolen the Woolen Company was entitled to sue both father and son for such invoice price or any deficiency thereof, and if such suit was not desired the obedient directors of the Niagara Company could foreclose on the Horowitz real estate and so put the Niagara Company in funds to pay pro tanto. In short, the Woolen Company so arranged matters that while carefully avoiding all such words as sale or conveyance, and procuring Horowitz to agree to such avoidance, it was from the moment of delivering goods contractually entitled to recover from Horowitz the sale price of those goods, and could not be compelled to resume possession of any of them; yet it always claimed and now claims to own outright what it would not take back and could sue for the price of. If this method of openly doing business is legal, the defendants must prevail; but legality is not to be determined by words. A formal conveyance in fee may be but a mortgage and will not be saved by the strongest habendum clause ever penned; and where fraud, whether by active deceit or legal misnomer, is averred and proved, the rights of parties are to be judged by their substantial position towards each other and not by the label they put on their transactions.

After patient consideration of this confessedly novel business device, I am convinced that the vice of defendants' position is that they have wrongfully labeled what they did. They urge that the transaction was (1) a consignment and nothing else, and (2) the bankrupts were not the consignees, but were at all times strangers to the goods, whence it follows that the Woolen Company owned the goods taken; but, if not, then, whoever owned them, Horowitz & Son certainly did not.

The first of these propositions will not bear investigation. A consignment is but a species of bailment, and if the so-called "consignment" does not respond to the legal tests for bailment, it cannot be what the label calls for. Whether a delivery of goods does or does not constitute a bailment is primarily determined by the question whether the identical article delivered is to be returned. But where there is no obligation on the part of the bailee to restore the specific article, even though he be at liberty to return another thing of equal value (instead of paying money), he becomes a debtor, and the title to the property is changed; the contract in such a case is one of sale. Foster v. Petti-

bone, 7 N. Y. 433, 57 Am. Dec. 530. And the same fundamental essential to any contract of bailment has been recognized and expounded time and again. See Cyc. p. 169, and cases cited; Benjamin on Sales (7th Ed.) p. 5; Powder Co. v. Burkhardt, 97 U. S. 116, 24 L. Ed. 973. The ingenuity of man has devised many variants of bailment, and undoubtedly the mere fact that the bailee may sell the goods is not enough to render the original transaction a sale (Ex parte White, L. R. 6 Ch. App. 397, affirmed 21 W. R. 465), while deliveries to "sell or return" are well recognized forms of bailment (Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093). A bailee also may have the right to account for goods lost or consumed at a fixed price (Westcott v. Thompson, 18 N. Y. 363) without thereby becoming a vendee, and it is even possible (in some jurisdictions) that, under an agreement made in good faith and clearly intended by both parties to be one of agency, a consignee of goods may sell at any price, while accounting to his consignor at a price fixed beforehand (Harris v. Coe, 71 Conn. at 163, 41 Atl. 552).

It remains, however, always true that what the contract means is a question of fact, sometimes to be submitted to a jury (Crosby v. D. & H. Canal Co., 119 N. Y. 333, 23 N. E. 736), but finally, when the facts are ascertained, presenting a question of law for the court (Westcott v. Thompson, supra). The contract between the Woolen Company and Niagara Company does not respond favorably for defendants to even the most generous test. It has never been held that one to whom goods were delivered, which he not only might sell, but must pay for whether he sell them or not, and who also cannot return any of the merchandise, is a bailee, and if he be not a bailee he cannot be a consignee.

In my opinion the contracts in question plainly show an endeavor to obtain for the Woolen Company all the rights of both vendor and bailor, while denying to the Niagara Company the privileges of either a vendee or bailee. This cannot be done as against creditors who are entitled to have the test of law applied to the transaction, however valid as between the parties themselves. The authorities on this subject (after the inherent nature of the contract is ascertained) have been so recently collected in Referee Dexter's able report (In re Penny & Anderson, 176 Fed. 141) that further citation seems superfluous. See, however, under Bankruptcy Act of 1867, In re Linforth, 4 Sawy. 370, Fed. Cas. No. 8,369; Nutter v. Wheeler, 2 Lowell, 336, Fed. Cas. No. 10,384.

Holding then, as I now do, that in legal effect the delivery of the goods in question to the Niagara Company constituted a sale to that company, it remains to consider whether this finding can benefit the creditors of Horowitz. In this branch of the case I find no difficulty, although no similar litigation has been instanced. The analysis above made of the contract between the Woolen Company and the Niagara Company has assumed (for argument's sake) that the latter was an independent concern actually making contracts on its own behalf and maintaining a real existence separate and apart from the Woolen Company and from Horowitz. It is, however, too plain for argument that such was not the case; if it had not been for the agreement of Horowitz & Son guaranteeing the performance of every covenant and obli-

gation entered into by the Niagara Company and for the real estate security furnished (in effect) by Philip Horowitz as collateral to the promise of his firm, the written engagements made between the Niagara Company and the Woolen Company would have been absurdities. There was no real person for the Woolen Company to contract with, except the bankrupts, and the whole and avowed meaning and intent of the arrangement was not to consign goods to the Niagara Company, but to enable Horowitz & Son to sell goods at their own prices without owning them. If the Woolen Company could not have dealt with an independent Niagara Company in the manner it did without having its dealing result in a sale, then that situation is not bettered by the intervention between the Woolen Company and Horowitz of a paper corporation which was merely another name for the Woolen Company itself. If the Niagara Company had really been an independent concern, had itself become bankrupt with numerous creditors, and the Woolen Company had removed from its premises goods in like manner as it removed them from Horowitz's store, then, for the reasons above given, such creditors through their trustee could have recovered against the Woolen Company. If, however, Niagara Company had carried on its own real and independent business through Horowitz's clerks and mingled its goods with Horowitz's goods, then it is true that Horowitz's creditors could have had no recourse against Woolen Company, whatever might have been their rights against Niagara Company, and Horowitz would then have been a stranger to the Woolen Company, however intimate might have been his relations with the Niagara Company. But when the Woolen Company in the very beginning creates the Niagara Company, not for the purpose of doing business with it, but for the purpose of doing business with Horowitz, then the real substantive agreement made is not the idle form of the consignment contract with the Niagara Company, but that which was intended as between the Woolen Company and Horowitz and expressed with perfect plainness in the latter's indemnity agreement. From what source was the Woolen Company to receive payment for its goods? From the goods themselves, if possible. But who was to sell those goods? Plainly Horowitz, and, if he could not sell them, to whose property did the Woolen Company have recourse? Nominally to the capital stock of the Niagara Company, which, however, meant no more than the foreclosure of a mortgage upon Philip Horowitz's house.

The legal effect of this arrangement was exactly the same as that even more plainly expressed in the consignment agreement between the Woolen Company and Horowitz of 1901, with this difference only: That so far as the paper writings are concerned Horowitz could return in 1901 goods he did not want; whereas, when in 1902 the transparent window of the Niagara Company was erected between himself and the Woolen Company he was forbidden that privilege. It is highly improbable that in practice there was any such difference between 1901 and 1902, but the difference between the written documents is clear. It results, therefore, that in my opinion the legal effect of the transactions shown in evidence is that at the time defendants removed the goods which are the subject of this suit such goods had been delivered to Horowitz & Son and were in their possession in pursuance of the

, contracts of November 25, 1902, whereof the legal result was to render the persons to whom the goods were delivered and intended to be delivered (i. e., Horowitz & Son) the vendees of the same.

The complainant will therefore have an interlocutory decree requiring the defendants to account for the goods admittedly taken, or the value of the same, together with costs to be taxed.