JOHN L. ROPER LUMBER CO. v. PORTSMOUTH FISHERIES CO.

(District Court, E. D. North Carolina. September 24, 1919.)

1. SHIPPING ☞54—CHARTERER ENLARGING LIABILITY FOR DAMAGE FROM THAT
   OF BAILEE TO INSURER.

   Where respondent, who chartered libelant's dredge, agreed, in event it
   was impossible to obtain insurance, to assume the same liability for
   damage or loss as an insurance company would if a policy were issued,
   respondent enlarged its liability as a bailee into that of an insurer, and
   became liable for the stranding and sinking of the dredge as a result of
   perils of the sea.

2. INSURANCE ☞403—PERILS OF THE SEA WITHIN MARINE INSURANCE.

   Where a dredge which it was sought to tow from one point to another
   sank during the night, held, that the sinking was a result of the perils of
   the sea, and would be included in a marine policy.

3. SHIPPING ☞42—CHARTERER OF VESSELS ACCEPTING SAME ON OWN RESPONSI-
   BILITY AND UNDER WARRANTY.

   Where respondent, after examination, chartered a dredge as suitable
   for its purpose, and signed a receipt accepting the same as in satisfactory
   condition, held, that respondent, who assumed the liability of an insurer,
   must be deemed to have accepted the dredge on its own responsibility,
   and not on any implied warranty as to seaworthiness.

4. SHIPPING ☞58(3)—MEASURE OF DAMAGES FOR LOSS OF VESSEL.

   On libel against respondents, who chartered a dredge and agreed to
   assume liability as an insurer to the extent of $6,000, held, that the
   dredge, which was sunk, was worth $6,000, in view of the increased cost
   of materials.

In Admiralty. Libel by the John L. Roper Lumber Company against
the Portsmouth Fisheries Company. Decree for libelant.

Small, MacLean, Bragaw & Rodman, of Washington, N. C., for li-
belant.

Guion & Guion, of New Bern, N. C., for respondent.

CONNOR, District Judge. On and prior to October 1, 1917, libel-
ant owned a suction dredge, moored at its "mill dock" in Belhaven,
N. C. Respondent, being engaged in the construction of a fish factory
at Portsmouth, N. C., desired to rent a dredge of the character of that
owned by libelant, and on October 17, 1917, wrote its superintendent
as follows:

"Portsmouth Fisheries Company,

"Morehead City, N. C., Oct. 17, 1917.

"Mr. A. T. Gerrans, General Superintendent, New Bern, N. C.—Dear Sir: We
learn that you have a small suction dredge at Belhaven, N. C., and if there is
any way you can possibly let us have it for about two weeks' work at Ports-
mouth, N. C., we will greatly appreciate it, and pay your charge for same.

"We are just completing a fish factory at Portsmouth, and had engaged the
dredge Croatan from the government; but at the last moment they required
us to insure it for $30,000, and we were unable to get a company that would
write it. We then bought machinery to equip us a small dredge of our own,
and that machinery is now hung up in Philadelphia, and we cannot tell when
the embargo will be lifted. We mention these facts to let you know the sit-
uation we are in, and if you can do anything to help us out we will be under
many obligations to you.

"Very truly yours,          Portsmouth Fisheries Co.,
                            "W. M. Webb, Sec. & Treas."

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This letter resulted in the following correspondence:

"Oct. 19, 1917. File 27.

"Portsmouth Fisheries Co., Morehead City, N. C.—Dear Sirs: We have a small suction dredge at Belhaven that is not being used at the present time, but is contracted for on November 15th.

"I do not know whether this machine would suit you or not. It would be necessary for you to go over to Belhaven and find out. In case it did suit you, our charges for renting the boat would be $25 per day from the day that she left Belhaven until the day that she was returned there by you.

"The valuation of the boat would be $6,000; same would have to be insured, both fire and marine risk, in our favor, for this amount. The boat would have to be accepted and taken charge of by your towboat and returned in first-class condition, wear and tear excepted, and under no circumstances would our contract of November 15th have to be interfered with by our letting you have this boat, as you specified for two weeks.

"Should it so happen that you should need it longer than you figure, you must be prepared to deliver same at Belhaven upon call. Should be glad to have you go and see the boat and advise further.

"Yours very truly,                      A. T. Gerrans,
"ATG/Aq.                               General Superintendent."

"Morehead City, N. C., Oct. 24, 1917.

"Mr. A. T. Gerrans, G. S., New Bern, N. C.—Dear Sir: Referring to yours of the 19th, we sent a man to Belhaven to look at the dredge, and we think it will do our work. This man returned last night, stating that there was some talk of a sale of the dredge, and that you would advise us if we could proceed to comply with your demands, and arrange to tow the dredge to Portsmouth. We are anxious to get it right away, so we may be through by the 15th of November.

"We do not believe that we can get insurance on the boat, but if we take it we will assume the responsibility to the amount of $6,000. However, if you have any connection that will insure it, and you will place it, we will pay the premium. We presume that you can get term insurance, and in our case 30 days will more than cover the time it will be in our possession.

"If we can get it, it is our intention to get a man at Ocracoke, who has handled this machine before, to operate it for us, and we are now waiting on your decision before we proceed further.

"Hoping to have a favorable reply, we are,
"Very truly yours,                     Portsmouth Fisheries Co.,
                                        "W. M. Webb, Sec. & Treas."

"Telegram.

"Norfolk, Va. Oct. 29, 1917, 10:15 A. M.

"W. M. Webb, Sec., Portsmouth Fisheries Co.. Morehead City, N. C.

"You can send immediately for dredge at Belhaven. We understand your letter of twenty-fourth to be acceptance of all conditions stipulated in our letter of October nineteenth, and if insurance cannot be obtained your proposition of assumption of liability of six thousand dollars will be substituted. Your representative to deliver your order and to sign receipt for boat being in satisfactory condition when taken.        John L. Roper Lumber Co."

"Telegram.

Morehead City, N. C., Oct. 29, 1917.

"John L. Roper Lumber Co., Norfolk, Va.

"Telegram received. Will send for dredge to-morrow or next day.
                                        "Portsmouth Fisheries Co."

"Telegram.

"Norfolk, Va., Oct. 29, 1917, 10:20 A. M.

"Mr. William Collins, Supt., Belhaven, N. C.

"You can deliver an order Portsmouth Fisheries Company the dredge taking receipt specifying that the boat is accepted as being in satisfactory condition. Be sure and take such a receipt.                    A. T. Gerrans."

260 F.—64

"To Whom It may Concern:

"The bearer is authorized to receipt for dredge.
          "Yours,                                   Portsmouth Fisheries Co.,
                                                        "By W. M. Webb, S. & T.
"Morehead City, N. C., Oct. 29, 1917."

The "bearer" of Exhibit No. 7 was S. F. Piner, who delivered the order to Mr. Collins, the representative of libelant at Belhaven. He found the dredge at the "mill dock" of libelant's mill at Belhaven, in water of four feet depth. She is described as follows:

"Her hull was 20 feet width and 50 or 60 feet long; the boiler was set to the aft of the rear end; the engine that drives the pump was set to the front and nearly in line with the boiler; the rotary pump was set to the left in the hold, as it was called, right on the platform, just behind this pump, to the right of her, was a double engine, and my recollection is had four drums; two drums represented the cable that handles the spuds on the side, and the other two drums represented the rising and lowering of the agitator. The end where the agitator is, when it is in the water, the top of the deck is not over four to six inches above the water; the other end is, I suppose, two feet; it sits on an angle, and when it is pulled, it is pulled from the right end. There is a pump to keep the water out. When it is being towed, it is sheathed up about six feet high. * * * It is customary when she is being towed to keep steam on it; that was a reasonable precaution."

The siphon was directly connected with the boiler for the purpose of pumping water out of the hull; "all you have to do is to turn the valve and it sucks it up."

Piner examined the dredge and signed the receipt, as follows:

"John L. Roper Lumber Company,
                                          Belhaven, N. C., Oct. 31, 1917.
"Received of the John L. Roper Lumber Company the suction dredge Sandwich for account of the Portsmouth Fisheries Company on their contract with the Lumber Co. Said boat being accepted as being in a satisfactory condition to us.                                  Portsmouth Fisheries Co.,
                                                        "S. F. Piner."

This receipt was forwarded to libelant, inclosed in the following letter:

"John L. Roper Lumber Company,
                                          Belhaven, N. C., Nov. 1, 1917.
"Mr. A. T. Gerrans, G. S.; New Bern, N. C.—Dear Sir: I am inclosing herewith receipt from Portsmouth Fisheries Co., signed by S. F. Piner, for dredge Sandwich, which leaves here this A. M.
          "Yours truly,                            W. M. Collins, Supt."

On November 1, 1917, Piner wired respondent:
                                          "Belhaven, N. C., Nov. 1, 1917.
"W. M. Webb, % Portsmouth Fisheries Co., Morehead City, N. C.
"Boats arrived yesterday all right. Just got dredge in shape this morning. Leaving for Portsmouth today.                        S. F. Piner."

Piner says that he could examine only the deck of the dredge; could not examine her hull in the water; "had the engines fired up on the boiler; that part was satisfactory." He says that something was said between Collins and himself regarding his inability to examine the hull. Collins denies this, and is corroborated in his denial. He was not present when the receipt was signed. He dictated it and left

for other parts of libelants' works. While it was difficult to go into the lower part of the dredge to examine her hull, it was practicable to do so, and nothing was said or done by libelant's representative to prevent Piner from doing so; nor was any statement made by any of said representatives to induce or suggest that Piner should not make a thorough examination of every part of the dredge. Piner says:

"I had been engaged running by water all of my life, since I was eleven years old. I lived on a boat that length of time." Had experience in towing but "no deep sea towing."

He was in the employment of respondent, engaged in fishing. The bottom of the water in which the dredge was moored was mud; the water was subject to wind tides. He says:

"You can take any leaky boat, and put them on a mud bottom; it will tighten them. Still it will have no lasting power to it, liable to drop out at any time, especially in moving the boat. Under tow it would have a tendency to hold the seams together. When it stopped, it would have a tendency to open the seams. The weather was clear and the water smooth; but little breeze. Piner towed the dredge with two crews on the tows. Capt. Foster on the head boat, and six or seven men on the fishing boat. Left Belhaven about 12 o'clock; made first stop at Judith's Marsh, about 25 miles, about 7 o'clock at night. Dredge was not leaking then. Weather was fair, "but it looked doubtful about taking the run across the sound with the tow; so we stopped there to wait until the moon rose, to see what the conditions were. There was no one on the dredge."

Piner says:

That he went on board the dredge just before night to put the light on her. "We were still towing then. The men came back and reported that the dredge was not leaking any, so I never bothered to go aboard any more; but sat up until about 12 o'clock, when I went and found the weather didn't suit me to start across; so I decided to lay in there until morning."

The dredge was lying between two entrances to a harbor. When he went to bed the wind was about north, as near as he could judge; moderate then; not blowing any to hurt; no sea at all where we were lying. The dredge was in ten feet of water. The wind was "breezing" the next morning; at 8 o'clock blowing "right heavy." The dredge had not leaked while being towed, nor when lights were put on; "at daybreak she was sunk" on bottom. Towed about four miles an hour. When Piner examined the dredge at Belhaven, the tide was low. She was on bottom; about three feet water. He went over the dredge four or five times; was there two days. No one told him not to examine the hull. "They said it was in good condition." Could have put her on the "stays." Cannot tell anything about the hull from an examination of the inside. The reason I did not haul her out "was in a hurry, and these people said her bottom was all right." In this he is not corroborated, and his statement is denied. The dredge is not used for navigable purposes; only towed; stays pretty much in one place. The steam was not up; no boats on her side. The Sound is one of the roughest pieces of water in the state; sometimes smooth; was on that day. The dredge evidently sprung a leak, while being towed; probably the action of the water washed the mud out of her seams. No other explanation is offered or suggested.

The only negligence which can reasonably be charged to the representatives of respondent is their failure to keep up steam and have some on the dredge to pump the water out when it was found that she was leaking. It would seem that this should have been done. It is suggested that a boat should have been placed on each side of her. The other precautions would have been more certain to prevent her from sinking. It is insisted by the respondent that, in offering to lease or rent the dredge, libelant warranted that she was tight, staunch, and seaworthy; whereas it argues, in the absence of evidence of any other cause for sinking, she sank because her hull was in bad condition. There is evidence that the boat, moored in fresh water, would be "eaten into by some insects."

However, this may be, the libelant contends that, by the terms of the contract, respondent was to "go over to Belhaven and find out whether the machine would suit them." It sent a man to Belhaven for that purpose, and on October 24th wrote that it thought it would do its work, to which on October 29th libelant telegraphed:

"You can send immediately for dredge at Belhaven. * * * Your representative to deliver your order and to sign receipt for boat being in satisfactory condition when taken."

This proposition was accepted by telegram. Libelant's superintendent, wired its agent at Belhaven to deliver the dredge, "taking receipt specifying that the boat is accepted as being in a satisfactory condition. Be sure and take such a receipt." Respondent's agent, Piner, presented the order, and the dredge was turned over to him for examination. I am unable to find that libelant's agent did or said anything which was calculated to restrict the examination or made any representation calculated to do so. Full opportunity was given Piner to make such examination as his duty to respondent required. There was no valid reason why he did not make a thorough examination of her hull. He accepted the dredge and executed a receipt therefor, as "being in satisfactory condition to us." This closed the contract in respect to the condition of the dredge. The terms of the contract were plain, and libelant performed its obligation in strict accordance therewith. Whether she sank because of the defective condition of her hull, or by reason of the failure of respondent's representatives to keep up steam and have a crew on her to operate the pumps to pump the water out, as it came in through the seams, opened by the action of the water while she was being towed, are not very material, because, under the terms of the contract, respondent assumed the liability for her safety as insurer.

On October 19th, the general superintendent of libelant wrote respondent:

"The valuation of the boat would be $6,000. Same would have to be insured, both fire and marine risk, in our favor for this amount. The boat would have to be accepted and taken charge of by your own boat and returned in first-class condition, wear and tear excepted."

Respondent answered October 24th:

"We do not believe we can get insurance on the boat, but if we take it we will assume the responsibility to the amount of $6,000. However, if you

have any connection that will insure it and you will place it, we will pay the premium. We presume that you can get term insurance and in our case thirty days will more than cover the time it will be in our possession."

Libelant, on October 29th, wired respondent that it could send immediately for the dredge:

"We understand your letter of twenty-fourth to be acceptance of all conditions stipulated in our letter of October nineteenth, and if insurance cannot be obtained your proposition of assumption of liability of six thousand dollars will be substituted."

Respondent on October 29th wired libelant:

"Telegram received. Will send for dredge tomorrow or next day."

[1-4] Libelant on November 2d made effort to get insurance on the dredge, but failed. The dredge was taken by Piner with the result hereinbefore set forth. By this contract respondent assumed the same liability for damage to her or loss as an insurance company would have done if a policy had issued. The liability was that of a bailee, as insurer. A bailee's common-law liability exempted him from loss arising from inevitable accident. A bailee may, however, enlarge his legal responsibility by contract, express or fairly implied, and render himself liable for the loss or destruction of the goods committed to his care; the bailment or compensation to be received therefor being a sufficient consideration therefor. Sturm v. Boker, 150 U. S. 312 (330), 14 Sup. Ct. 99, 105 (37 L. Ed. 1093). The extent of the liability assumed by the terms of the contract is the same which an insurance company would have taken in a policy insuring the dredge against the perils of the sea, and it would seem that the stranding and sinking of the dredge was within the risks covered by a policy.

While, as argued by counsel for respondent, in such cases there is an implied warranty that the ship or dredge was seaworthy, in the sense of fitness to discharge the work or purposes for which she was constructed, the respondent by its contract assumed the duty of making its own examination of the dredge and accepting her upon its own judgment, and not relying upon any implied warranty. It said, in response to libelant's terms that the dredge must be insured for $6,000, that it did not believe that it could get insurance, "but if we take it we will assume that responsibility to the amount of $6,000." This proposition was accepted, and, after examination by the agent sent for that purpose, accepted. While the terms imposed are rigid, they are too plain to be misunderstood. There was no concealment or misrepresentation. It appears that libelant purchased her at a public sale by a receiver for $1,000 and put repairs and additions to the amount of $2,500 or $2,600 upon her. This would be a fair measure of value, but for the uncontradicted evidence that, by reason of the increased cost of material incident to the war, she could not be replaced for less than $7,000 or $8,000. This, of course, is an estimate of libelant's superintendent.

I am of the opinion, upon the evidence, that $6,000 was a fair value to place upon it, and was so recognized by respondent. She was accepted and receipted for "as being in a satisfactory condition to us."

While not necessary, to impose liability upon respondent for her loss, to find that its agents were negligent in handling the dredge, there is evidence that the reasonable precaution of having, during the towing and while tied up during the night, to have her steam up, with a crew ready to use her pumps when she was found to be leaking, the liability rests upon the contract by respondent, which expressly assumed the responsibility of insurer. The extent of the liability is fixed by the parties at $6,000. There is no satisfactory evidence of the value of the pipe returned.

A decree may be drawn for $6,000, with interest from the date of the libel, and cost.